Opinion
 

 SONENSHINE, J.
 

 Lawrence D. appeals from a judgment pursuant to Welfare and Institutions Code
 
 [1]
 
 section 366.26, terminating his parental rights to seven-year-old Amanda and five-year-old David, both of whom the court found adoptable. This is the second time we have reviewed the dependency proceedings. In an unpublished opinion about one year ago, we denied Lawrence’s petition for writ in which he contended the Orange County Social Services Agency (SSA) failed to provide reasonable reunification services and the court improperly denied his request for a bonding study and a continuance.
 
 (Lawrence D.
 
 v.
 
 Superior Court
 
 (June 12, 1996) G019230 [nonpub.opn.].) In this appeal, Lawrence’s chief contention, distilled to its essence, is the court may never terminate the parental rights of an incarcerated parent who is complying with a case plan as best he or she can under the circumstances. His second assertion is the court erred in failing to apply the benefit exception of section 366.26, subdivision (c)(1)(A). We reject both arguments.
 

 Factual and Procedural Background
 

 When Amanda and David were taken into protective custody nearly three years ago, Lawrence was in prison, and had been there for fourteen months, for first degree burglary. He had not seen the minors for five months. His history included drug and alcohol abuse, as well as multiple arrests and a prior conviction for assault and battery. He and the children’s mother, Linda G., a substance abuser with a record of felony welfare fraud, had never provided a stable and secure home for the family. There were three previous episodes of protective custody based on neglect, caretaker absence and abandonment. Linda physically abused Amanda.
 
 [2]
 

 Except for a few brief months when he resided with a paternal aunt, David’s sole placement throughout the dependency was in the foster home of
 
 *817
 
 Jill V. and Mike H. Amanda, on the other hand, had to live in a group home for almost two years, due to her serious emotional and behavioral problems and an apparent attention deficit disorder. A few months before the .26 hearing, she began spending weekends with her brother and Jill and Mike as a transition to moving into the foster home. The foster parents told SSA they wanted to adopt both minors because they needed each other and ought to be together.
 

 Lawrence has remained incarcerated for the duration and is not scheduled to be released until January 1998. According to the parties’ stipulation, he “maintained regular and consistent contact with both children via cards, letters, in-person visits and telephone calls.” The parties further stipulated that the paternal aunt who facilitated visitations between the father and the minors would testify “the kids [were] excited to see their father, they jump up and down when they see him, they love their father, they enjoy the visits very much, they kiss their father and are affectionate with him.” David’s foster parents, however, observed it did not seem to matter to the minor whether or not he had visits; his attitude about seeing his father was “rather nonchalant.” And Amanda’s CASA (court appointed special advocates) worker noted the child never voluntarily talked about either of her parents, and when asked how her visits with her father went, simply replied, “Fine.”
 

 Lawrence believed he had a good relationship with the minors and did not want his parental ties severed. Yet, he knew his incarceration presented insurmountable obstacles to reunification, and he appeared resigned to the fact he could not take care of his children for a long time. Although he did not testify at the .26 hearing, the court allowed him to make the following statement for the record: “I never wanted my son and daughter to be adopted. However, it is beyond my control to parent my children because of mitigating factors in my life at the present time. I cannot bring myself to consent to adoption or place my signature on a legal form of relinquishment. I love my children, and the only way for me to love them is to do what is best for them, not what is best for me. [<]0 I am letting God raise my blessed son and daughter by faith as seen in First Corinthians 13, and I would like to say a prayer for my children. [H God grant me the serenity to accept the things I cannot change, the courage to change the things I can, and the Almighty wisdom to know the difference.”
 

 By August 1996, when the .26 hearing finally occurred, both minors' had made great progress. David was in good health, developing normally, bonded to his foster parents and thriving in his placement, which he called “my home.” Amanda, initially an “angry, sulking child,” described herself as “ugly and stupid.” She was prone to such violent temper tantrums and
 
 *818
 
 screaming fits she was suspended from kindergarten. Her contact with her foster parents transformed her: Her self-esteem greatly increased; she thought of herself as pretty, smiled all the time and appeared “excited about life.” Her CASA worker attributed Amanda’s change in large part to her contacts with her sibling and Jill and Mike: She stated, “Amanda ‘doesn’t feel as cheated’ now that she has people in her life who care for her and are consistent.” The minor moved into the foster home just a few days before the hearing.
 

 The court admitted five court reports into evidence, without objection. Lawrence did not cross-examine the preparers or call any witnesses, nor did he present a section 388 petition. After hearing arguments, the court found by clear and convincing evidence it was likely both minors would be adopted. It ordered the parents’ rights terminated and selected adoption as the permanent plan.
 

 Discussion
 

 Before turning to Lawrence’s arguments, we are compelled to comment on the inappropriate tone of his brief, in which he characterizes himself as a nonoffending parent and attributes to Linda the full blame for the dependency proceedings. As a matter of hard fact, Lawrence’s participation in the lives of his children between 1991 and 1994 was restricted to his occasional visits to “check up” on them. The inadequacy of his involvement is perhaps best illustrated by the three instances of protective custody during that period. Then Lawrence chose to engage in serious criminal conduct, resulting in his long-term incarceration. Clearly, it was he, not SSA, who deprived his children of the protection they so badly needed against their mother’s neglect and abuse. Indeed, he took himself out of the family picture long before SSA came on the scene. Unfortunately, he has not yet come to terms with the reality that
 
 two
 
 parents failed to take responsibility for Amanda and David.
 

 I
 

 Lawrence contends the juvenile court deprived him of due process when it terminated his parental rights. He does not assert, as do most incarcerated parents, that SSA failed to offer or provide reasonable reunification services. Rather, he argues he “fully complied” with the requirements of his reunification plan, “to the extent permitted by his circumstances,” and there is no evidence he will be an unfit parent when he is released from prison.
 

 The argument fails. While we laud Lawrence for the positive efforts he made in prison (for instance, attending Narcotics Anonymous and Alcoholics Anonymous meetings and completing a 12-hour parenting course), we
 
 *819
 
 note the court made findings at every juncture along the way that although reasonable services were provided or offered, Lawrence had not substantially complied with his case plan. And at the six- and twelve-month review hearings, Lawrence
 
 stipulated
 
 to those findings. As for findings at the 18-month review, the record shows Lawrence had been involved in a prison fight, resulting in a loss of privileges, including participation in any of his programs and visitations with his children. Thus, Lawrence’s
 
 factual
 
 premise—that he fully complied with his reunification plan insofar as possible—is simply not supported by the record.
 

 Furthermore, Lawrence is incorrect in his
 
 legal
 
 premise that the court could not terminate his parental rights without evidence of his unfitness to parent the minors. He misapprehends the nature of the .26 hearing and ignores well-established law. As stated by the Supreme Court in
 
 Cynthia D.
 
 v.
 
 Superior Court
 
 (1993) 5 Cal.4th 242, 254 [19 Cal.Rptr.2d 698, 851 P.2d 1307], “It is not the purpose of the section 366.26 hearing to show parental inadequacy, which had to have been previously established, and there is no burden on the petitioning agency to show at the section 366.26 hearing that the parents are ‘at fault.’ ”
 
 Cynthia D.
 
 reasons, “By the time termination is possible under our dependency statutes the danger to the child from parental unfitness is so well established that there is no longer ‘reason to believe that positive, nurturing parent-child relationships exist’ [citation], and the
 
 parens patriae
 
 interest of the state favoring preservation rather than severance of natural familial bonds has been extinguished. . . . By the time of the section 366.26 hearing, no state interest requires further evidence of the consequences to the child of parental unfitness . . . .”
 
 (Id.
 
 at p. 256.)
 

 In light of
 
 Cynthia D.,
 
 this court concluded, in
 
 In re Brittany M.
 
 (1993) 19 Cal.App.4th 1396, 1403 [24 Cal.Rptr.2d 57], “[Section 366.26 does not violate a parent’s right to due process in failing to mandate an express finding of parental unfitness. The detriment findings made at each review hearing preceding the section 366.26 hearing [citations] sufficiently establish parental unfitness to satisfy due process requirements.” Lawrence’s due process argument is defeated by established authority.
 
 [3]
 

 II
 

 Lawrence raised no issue below that the juvenile court should have obtained the minors’ testimony regarding their wishes for a permanent plan.
 
 *820
 
 (§ 366.26, subd. (h).) He is precluded from presenting it here.
 
 (In re Anthony P.
 
 (1995) 39 Cal.App.4th 635, 641 [46 Cal.Rptr.2d 107] [an appellant may not assert error on appeal when he or she failed to raise the issue at the trial court level].)
 

 Even were we to find the issue not waived, Lawrence cannot prevail on the merits. Section 366.26, subdivision (h) provides the court must “ ‘consider the child’s wishes to the extent ascertainable’ ” prior to terminating parental rights.
 
 (In re Leo M.
 
 (1993) 19 Cal.App.4th 1583, 1591 [24 Cal.Rptr.2d 253].) But the evidence need not be in the form of direct testimony in court or chambers; it can be found in court reports prepared for the hearing.
 
 (Ibid.)
 
 And Lawrence’s assertion the court must specifically ask how the child feels about ending the parental relationship is just plain wrong. As the
 
 Leo M.
 
 court aptly stated, “[I]n honoring [the minors’] human dignity ... we should not carelessly impose upon them decisions which are heavy burdens even for those given the ultimate responsibility to decide. To ask children with whom they prefer to live or to ascertain what they wish through other evidence is one thing. To ask those children to choose whether they ever see their natural parent again or to give voice to approving that termination is a significantly different prospect. . . . [W]e conclude that in considering the child’s expression of preferences, it is
 
 not required
 
 that the child specifically understand the proceeding is in the nature of a termination of parental rights.”
 
 (Id.
 
 at p. 1593, italics added.)
 

 What the court must strive to do is “to explore the minor’s feelings regarding his/her biological parents, foster parents, and prospective adoptive parents, if any, as well as his/her current living arrangements. . . . [A]n attempt should be made to obtain this information so that the court will have before it some evidence of the minor’s feelings from which it can then infer his/her wishes regarding the issue confronting the court.”
 
 (In re Leo M., supra,
 
 19 Cal.App.4th at p. 1592.)
 

 Here, there was a reasonable basis for inferring the minors’ wishes. David talked about “my home, my room, my dog,” in referring to his life with the foster parents. He thrived there and expressly stated how much he liked living with Jill and Mike. And there was evidence he was essentially apathetic about visiting Lawrence, indicating the relationship was not of great significance to him. As for Amanda, she never voluntarily spoke of Lawrence, and she gave only monosyllabic responses when questioned about her visits with him. Moreover, the record showed she was out of control and without self-esteem until she was exposed to the influence of the foster parents. From that point, she began what can only be described as a profound transformation, becoming “excited about life.” Finally, nothing would have
 
 *821
 
 been gained by eliciting her wishes directly because Amanda had “no solid concept of adoption and what that means.” There was sufficient evidence for the court to assess the minors’ wishes and their best interests.
 

 Ill
 

 Lawrence contends the court should have applied the benefit exception of section 366.26, subdivision (c)(1)(A). He argues there is no question he met the first prong of the statute—maintaining regular visitation and contact with the minors. In light of the stipulation to that effect, we agree. But we disagree with Lawrence’s further assertion he showed the minors would benefit from continuing the relationship.
 

 Lawrence acknowledges he cannot meet the benefit test of
 
 In re Beatrice M.
 
 (1994) 29 Cal.App.4th 1411, 1420 [35 Cal.Rptr.2d 162], which requires him to stand in a parental role to the minors. He also admits he falls short of the benefit standard established in
 
 In re Autumn H.
 
 (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535], requiring the parent to prove the strength and quality of the biological relationship outweighs the security and sense of belonging a new family would confer. Therefore, he urges us to reject both tests, claiming they impose requirements not intended by the Legislature and “effectively foreclose” application of the benefit exception in all but the “rare” case. He asks us to interpret the statute as requiring
 
 only
 
 regular visitation and contact.
 

 We are neither inclined nor authorized to ignore the second prong of the statutory benefit exception. (See
 
 San Francisco Unified School Dist.
 
 v.
 
 San Francisco Classroom Teachers Assn.
 
 (1990) 222 Cal.App.3d 146, 149 [272 Cal.Rptr. 38] [in construing a statute, the court “cannot create exceptions, contravene plain meaning, insert what is omitted, omit what is inserted, or rewrite the statute”].) The statute requires a parent to show there has been regular contact
 
 and
 
 “the minor would benefit from continuing the relationship.” (§ 366.26, subd. (c)(1)(A).)
 
 Beatrice M.
 
 and
 
 Autumn H.
 
 do not enlarge the parent’s burden; they simply define it.
 

 Lawrence asks us to reject
 
 Beatrice M.
 
 and
 
 Autumn H.,
 
 but offers no alternative definition of benefit which might encompass the facts of his case. Perhaps that is because the record so fully reflects the
 
 lack
 
 of a parent/child relationship, much less one that would outweigh the benefits flowing from the security of the prospective adoptive parents’ home. Contrary to Lawrence’s assertion, his failure to achieve the requisite relationship cannot be attributed to the mere fact of his incarceration. Amanda was four years old, David two and one-half, when their father was imprisoned for the
 
 *822
 
 second time. Before he was taken into custody, his contacts with the minors apparently consisted of little more than random encounters when Lawrence “checked up” to see how they were doing with their mother. As for more current circumstances, despite regular visits, David seemed indifferent to his father and Amanda was angry and disengaged. And both children were obviously shining in the light of Jill’s and Mike’s commitment. In short, Lawrence’s relationship with the minors, whether evaluated standing alone or weighed against the benefits of adoption, did not pass the statutory test even under a standard far less demanding than those articulated in
 
 Beatrice M.
 
 and
 
 Autumn H.
 

 [4]
 

 Amanda and David have spent almost three years suspended in the limbo of dependency. As we noted in our prior opinion, unfortunately Lawrence’s good efforts did not give him a guarantee his parental rights would be preserved throughout his prolonged incarceration. Ultimately, time ran out. Nonetheless, Lawrence should take comfort in the fact of his rehabilitation. If he perseveres, he, like his children, will achieve a truly heartening transformation.
 

 The judgment is affirmed.
 

 Wallin, Acting P. J., and Rylaarsdam, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied July 30, 1997.
 

 [1]
 

 All further statutory references are to the Welfare and Institutions Code unless otherwise stated. In addition, the selection and implementation hearing (§ 366.26) will be referred to as the .26 hearing.
 

 [2]
 

 There is no issue on appeal involving the mother, who chose not to attend the .26 hearing because of an outstanding warrant for her arrest.
 

 [3]
 

 Lawrence’s reliance on
 
 In re Terry E.
 
 (1986) 180 Cal.App.3d 932 [225 Cal.Rptr. 803] avails him nothing. The case interprets former Civil Code section 232, repealed in 1992. The proceedings here are governed by section 300 et seq., which statutory scheme abandons the unfitness standard. (See
 
 In re Cody W.
 
 (1994) 31 Cal.App.4th 221, 224-226 [36 Cal.Rptr.2d 848].)
 

 [4]
 

 In a tangential argument, Lawrence contends SSA should be estopped from opposing the benefit exception because “it did nothing to assist appellant in maintaining his relationship with the minors and opposed the bonding study.” The assertion is frivolous. In the first place, albeit the paternal aunt gratuitously provided the children with transportation to their visits, SSA facilitated telephone calls and provided Lawrence with writing materials and stamped envelopes to communicate with his children, and Lawrence did not challenge the reasonableness of his reunification services. In the second place, we decided the bonding study issue against Lawrence in our prior decision. Finally, Lawrence fails to suggest how estoppel would promote the best interests of his children.