Filed 6/30/14  In re Joshua R. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Joshua R., A Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>John R.,<br><br>    Defendant and Appellant. | A140055<br><br>(Contra Costa County Super. Ct. No. J1200401) |

In this dependency appeal, John R. (father) seeks relief from the juvenile court order terminating his parental rights with respect to his son, Joshua (born April 2005). Specifically, father argues that the juvenile court abused its discretion by denying his petition for modification heard in conjunction with the permanency planning hearing in this matter.  He also contends that termination of his parental rights was improper under the "beneficial relationship" exception to adoption and because the juvenile court failed to ascertain and consider Joshua's wishes with respect to adoption as required by statute. Seeing no error requiring reversal of the juvenile court's termination order, we affirm.

# I.  BACKGROUND

Joshua R., the minor who is the subject of these proceedings, first came to the attention of the San Francisco County Children's Services Agency (Agency) in October 2011, when he was six years old.  At that time, Joshua was living with his father and step-mother in a San Francisco homeless shelter.  In the early hours of October 15, 2011, John R. and his wife got into an argument in front of Joshua, apparently involving the family's sleeping arrangements.  According to John, the shelter had put a mattress on the floor for Joshua, but he did not want his son to sleep on the floor due to the minor's allergies.  John became increasingly agitated, yelling and making threats.  In particular, he reportedly told shelter staff that they had " '[b]etter call CPS because I'm going to drive my car with my son to the bridge and flip it.' "[1]  In fact, John became so distressed during the incident that he broke his hand when he hit an object.  The police were called, and John was transported to San Francisco General Hospital and placed on a brief psychiatric hold pursuant to section 5150 of the Welfare and Institutions Code.[2]  After the altercation, the minor's step-mother took the family car and left, telling shelter staff that Joshua was not her son and that they should look after him.

According to the staff at the homeless shelter, Joshua was "frequently" left in their care and they had previously taken him to the hospital for "swollen eyes and breaking out."  In addition, the police reported that they had responded to a similar call from the shelter within the last month, during which John R. had also required assessment under section 5150.  Moreover, upon investigation, the Agency learned that John R. had a long

---

[1] At the contested permanency planning hearing in this matter, father denied ever making this statement.

[2] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.  Pursuant to subdivision (a) of section 5150, "[w]hen a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . or professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services."

criminal history, including convictions for grand theft (1979), burglary (1980), robbery (1981), felony pandering (1984), and felony narcotics possession (1994), as well as numerous probation violations. He was arrested in 2004 for sexual assault and assault, and, most recently, on June 15 and December 24, 2011, for narcotics possession. Further, Joshua's mother had previously reported domestic violence by John and stated that he had recently left threatening messages for her. Finally, John R. has a total of seven children, three of whom had been involved in the dependency system at the time of the October 2011 incident. Two adult children were previous juvenile court dependents. A third, J.R., was removed from John R. due to his incarceration and remained in a permanent plan of long term foster care with her maternal grandmother.[3]

As a result of the October 15 incident, the minor was detained in foster care. On October 17, 2011, the Agency called John R. twice in an attempt to meet with him regarding Joshua, but he stated he was too busy with a doctor's appointment, getting his car out of impound, and "other things." The next day, the Agency filed a petition alleging that Joshua came within the jurisdiction of the juvenile court under subdivisions (b), (g), and (j) of section 300.

The minor was formally detained at the detention hearing on October 19, 2011. Supervised visitation was ordered for both parents, with the Agency given the discretion to move to unsupervised contact. On November 7, 2011, John R. was declared to be the presumed father of Joshua. Then, on November 23, 2011, the Agency filed a first amended petition which dropped the allegation under subdivision (g) of section 300 and

---

[3] John R. has two additional children (half-siblings of Joshua) who were residing with their mother at the time these proceedings commenced. According to social worker reports filed in August and October 2013—immediately prior to the permanency planning hearing in this matter— these two half-siblings (then ages three and five) had recently also become the subject of dependency actions in Contra Costa County. Despite John R.'s acknowledgement that the mother of these children " 'is crazy,' " he had failed to visit the half-siblings—or provide any care or support for them—since June 2011. John R.'s seventh child was born during the pendency of these proceedings to his then-current wife.

added a subdivision (b) allegation regarding mother's mental health issues.[4]  A contested hearing on jurisdiction and disposition was set for January 30, 2012.

In the meantime, Joshua was moved to the home of his maternal grandparents on December 9, 2011.  The Agency had identified Joshua as "a very high need child in terms of his emotional and behavioral presentation."  Specifically, Joshua's behavior, cognition and speech were noticeably delayed for his age, and he was a regional center client.  In addition, he suffered from enuresis, encopresis, allergies and anemia.[5]  Joshua had previously been prescribed psychotropic medication, but was no longer taking it.  He had a possible diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) and could be aggressive, hitting other children and adults.  Although Joshua had been enrolled in several developmentally appropriate programs, his attendance appeared to have been inconsistent.  The Agency concluded that he would need "long term close supervision, structure and services for his stabilization," which he seemed to be receiving from his grandparents.

At the contested hearing on January 30, 2012, both parents submitted to jurisdiction after significant amendments were made to the first amended petition by the juvenile court.  As a result of these negotiated alterations, the sustained petition in this matter contained only a single allegation involving John R., which stated:  "The father's ability to care for the child is impaired in that he has been diagnosed with anxiety and PTSD for which he requires further assessment and has started treatment.  The father was put on 5150 hold when he threatened to harm himself and others."

---

[4] Renee H., the minor's mother, reportedly has developmental delays and mental health issues, including schizophrenia.  Although the couple supposedly shared custody of Joshua—with Renee having the minor during the summer and John during the school year—Renee showed little interest in reunification and generally supported the adoption of the minor by her parents.  She is not a party to these proceedings.

[5] Indeed, it was determined during the course of this dependency action that Joshua has the Thalassemia Anemia Trait, which is a gene mutation that leads to decreased production of structurally normal blood cells.  This condition requires monitoring, medication for chronic anemia, and repeated blood transfusions.

4

In the dispositional phase of the proceedings, Joshua was declared to be a juvenile court dependent and formally removed from the home of his father. In addition, reunification services were ordered for both parents. Specifically, with respect to John R., a reunification plan was ordered which included: participation in mental health treatment, including medication as indicated; completion of a parenting class; completion of a substance abuse assessment and any recommended treatment, including testing as indicated; regular visitation with the minor; participation in the minor's educational and developmental planning; and maintenance of adequate housing. In particular, the Agency noted that John, mother, and the minor all had mental health issues requiring treatment and that "[i]t will be essential for the father to have effective mental health services in place prior to the minor[']s return to his care."

As a final matter, the San Francisco juvenile court determined that the minor's legal residence was Contra Costa County and transferred the case to that jurisdiction. At the transfer-in hearing on May 2, 2012, the Contra Costa County Children & Family Services Bureau (Bureau) reported that John R. had moved to Stockton with his wife. While he professed to be interested in reunification, he had "difficulty in following through with requests and referrals for services, including travel arrangements for visits with his son." With respect to Joshua, the Bureau stated that "it is clear that he is a child who has lacked stability and is likely suffering from his experiences." Finally, it also noted that John R.'s request that his son be transported to Stockton for visitation showed no understanding regarding how hard the trip would be for Joshua or how important is was for the minor to attend class regularly. At the conclusion of the hearing, the Contra Costa juvenile court set a six month review for July 2012.

John R. failed to appear for the six month review, and his compliance with his reunification plan was slight. Specifically, John R. had not participated in *any* mental health services despite a number of referrals and—though he had completed a substance abuse assessment—he had not followed through with the recommendations that he attend a 12-step program and find a sponsor. Moreover, despite being provided with transportation assistance by the Bureau, John had only visited with Joshua one time (on

5

June 29 for 90 minutes) since the case was accepted for transfer in April 2012. In fact, John R. told his social worker on a number of occasions that completing his reunification plan was just "too hard for him at this time." Joshua, in the meantime, was reported to be "very happy" in the home of his maternal grandparents. The Bureau noted that the minor was now attending school on a regular basis and that "[i]t is important that this child be given every opportunity to participate in school without absence." The juvenile court continued reunification services and ordered supervised visitation for John R. a minimum of one hour twice per month.

At the contested 12 month review hearing on December 19, 2012, John R. reported that he had entered an outpatient substance abuse treatment program at Highland Hospital in Oakland on November 5, 2012. In addition, he supplied documentation indicating that he had attended the program 39 times, including classes in anger management, parenting and substance abuse. However, prior to November 5, he had continued to use cocaine and ecstasy on a recreational basis and had not engaged in any substance abuse treatment during the reunification period. Moreover, John R. had still not participated in any mental health services. Specifically, he ignored numerous mental health referrals while the case was pending in San Francisco. In addition, although he was given a San Joaquin County referral by the Contra Costa County social worker and called for an appointment in her presence, he failed to follow through and stated that he was unable to participate in counseling because his life was "not stable." At best, John R. testified that there was a possibility that mental health treatment "will come along" if he progressed in his outpatient drug treatment program. Finally, according to the 12-month review report, John R. had visited with the minor only three times, despite the fact that he had relocated from Stockton to Richmond. A supplemental report documented one additional visit on December 14, 2012. Indeed, John R. confirmed that, since Joshua's dependency action was transferred to Contra Costa County in April 2012, he had only attended four or five visits with his son. Joshua, for his part, continued to do "extremely well" in the home of his maternal grandparents.

6

Under these circumstances, the juvenile court concluded that there was no substantial probability that Joshua could be safely returned to John R.'s physical custody within six months if additional reunification services were provided. (See § 366.21, subd. (g)(1).) Rather, citing John R.'s unavailability, his continued drug use, his "sporadic" visitation with the minor, and the lateness of his engagement in reunification efforts, the juvenile court terminated reunification services and set the matter for a permanency planning hearing pursuant to section 366.26. At that point, John R.'s request that the Bureau be given the discretion to move to unsupervised visitation "if he can provide a safe track record" was denied by the juvenile court judge.

While the minor's permanency planning hearing was pending, John R. filed a request for modification pursuant to section 388 on August 12, 2013. Specifically, John requested that reunification services be reinstated based on his continued progress in his outpatient substance abuse treatment program. At the conclusion of the contested permanency planning hearing on October 9, 2013, the juvenile court denied John R.'s 388 request, stating that "[a]t best" John was "making some progress in what has, for him, been a lifetime addiction issue." The court went on to emphasize John R.'s lack of any mental health treatment: "Most importantly, though, the serious problems that originally led to the dependency have really not been addressed at all by [John R.]. The mental health treatment and assessment component of the plan has even now not come close to being addressed." Thus, John R.'s "burden fell far short of the needed showing" to support the requested modification.

The juvenile court then considered the appropriate permanent plan for Joshua. Specifically, after argument, the court refused to apply the "beneficial relationship" exception to block the adoption of the minor and terminated the parental rights of both John R. and Renee H. A timely notice of appeal from father brought the matter before this Court.

II. DISCUSSION

A.      *Alleged Report Inaccuracies*

Underlying all of father's claims of error in this matter is his repeated assertion that his due process rights were violated because both child welfare agencies involved in the case routinely submitted incomplete, inaccurate, and inconsistent reports to the juvenile court, thereby irredeemably tainting the proceedings. Specifically, father complains that Bureau reports filed after the case was transferred to Contra Costa County consistently repeated jurisdictional allegations expressly found by the San Francisco juvenile court to be "not proven true." In addition, father criticizes the reports' descriptions of his visitation with the Joshua, arguing that they are so inconsistent that they cannot be deemed reliable. As a remedy, he requests that the case be reversed and remanded so that the juvenile court can reconsider its decisions based on accurate information. While we could decline to consider father's allegations because he failed to raise them in the juvenile court (*In re G.C.* (2013) 216 Cal.App.4th 1391, 1398-1399 (*G.C.*); *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411-412 (*Crystal J.*); see also Evid. Code, § 353, subd. (a)), we chose to reject them on their merits both to point out a critical flaw in father's understanding of the dependency process and to confirm that the proceedings below were fundamentally fair.[6]

It is true that, at the jurisdictional hearing in this matter, the juvenile court judge modified the first amended petition by deleting a number of allegations involving father's history of domestic violence, his extensive criminal record, and previous dependency proceedings involving his other children. Additionally, the father's specific statement that he threatened to flip his car with Joshua in it was also stricken from the petition. According to father, these modifications to the original petition amounted to a finding by the juvenile court that the stricken allegations were not proven true. As a consequence,

---

[6] Father's assertion to the contrary notwithstanding, his testimony at the permanency planning hearing challenging the veracity of certain statements contained in the reports submitted by the social worker was not the equivalent of a formal objection to the adequacy of those reports, or of any previous reports filed in connection with earlier hearings.

father argues, his due process rights were violated because the stricken allegations were later repeated in numerous social worker reports "as if the allegations had been proven true" and were relied on by the parties and the juvenile court in making their recommendations and determinations. The short answer to father's contention is that it is simply wrong. While the juvenile court did agree to make the alterations to the petition requested by the parties, it did so to facilitate a negotiated settlement and submission of the matter, a common practice in juvenile court. There was never a contested hearing on these issues; nor was there a finding that they were untrue. They were simply removed from the petition as unnecessary to support the assumption of jurisdiction by the juvenile court.[7]

Since it was never determined by the juvenile court that the complained-of allegations were untrue, they were appropriately included in subsequent social worker reports and were a proper basis for decision making. It is well settled that social worker reports—including any hearsay evidence they contain—are generally admissible at any phase of the juvenile dependency process. (§§ 281, 355, subd. (b); *In re Malinda S.* (1990) 51 Cal.3d 368, 376-377, superseded by statute in part as stated in *In re Cindy L.* (1997) 17 Cal.4th 15, 22, fn. 3; *In re Keyonie R.* (1996) 42 Cal.App.4th 1569, 1572-1573.) Indeed, "[o]ne specific area of dependency jurisprudence where the rules of evidence are relaxed is with respect to the reports and social studies prepared by the caseworker assigned to the family. The reports and studies contain not only the observations and recommendations of the caseworker, but also hearsay statements from family members and other witnesses. Despite their hearsay content, such reports are admissible to assist the court in its determinations." (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 914-915 (*Lesly G.*).)

---

[7] While the original record on appeal failed to include transcripts of the early hearings in this matter, we sought augmentation on our own motion to confirm that no express findings regarding the challenged allegations had been made. (See California Rules of Court, rule 8.155(a)(1)(B).)

Indeed, the juvenile court has broad discretion to admit and consider evidence and to make orders consistent with the best interests of a dependent minor. (See §§ 202, subd. (b) [dependent minors shall receive "care, treatment, and guidance" that is "consistent with their best interest"], 300.2 [primary purpose of dependency statutes is "to ensure the safety, protection, and physical and emotional well-being of children who are at risk . . ."]; 362, subd. (a) [juvenile court may make "any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child"]; *In re Cindy L., supra,* 17 Cal.4th 15, 35 [juvenile court's admission of hearsay evidence reviewed for abuse of discretion]; *In re Chantal S.* (1996) 13 Cal.4th 196, 201 [in dependency proceedings, "[t]he juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child"]; *In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104 (*Jose M.*) [juvenile court "has broad discretion to determine what would best serve and protect the child's interest"].) Given its mandate, "[i]f the juvenile court was not allowed to consider a complete social study report, it would not have 'a coherent picture of the child's situation' [citation] and would be severely limited in its ability to protect the child." (*Jose M., supra,* 206 Cal.App.3d at p. 1105.)

It is true that, at the contested permanency planning hearing in this matter, father denied ever making the statement that he intended to flip his car with Joshua in it. John R. has never claimed, however, that the admittedly prejudicial evidence of his domestic violence history, his significant criminal record (including a felony drug conviction), and his prior involvement with the dependency courts was untrue. A parent is not entitled to exclude evidence merely because they disagree with it or because it is prejudicial to their interests. (*In re Marianne R.* (1980) 113 Cal.App.3d 423, 427-428.) In particular, when determining whether a child is in present need of the juvenile court's protection, the court may consider past events. (*In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169.) If John R. disagreed with information contained in the social worker reports, he was free to cross-examine the social workers, present his own evidence, and subpoena any persons whose hearsay statements appeared in the reports. And, as stated above, he did testify at the

10

contested permanency planning hearing that he never made the statement about flipping his car. Thus, his due process rights were protected, and there was no error. (Compare *Lesly G., supra,* 162 Cal.App.4th at pp.914-915 [while social worker reports are generally admissible, due process requires "that parents be given the right to present evidence, and to cross-examine adversarial witnesses, such as the caseworker and persons whose hearsay statements are contained in the reports"].)[8]

## B. *388 Petition*

John R. also urges us to reverse the juvenile court's denial of his section 388 petition filed prior to the permanency planning hearing in this matter. The framework for analyzing the denial of a 388 petition is not in dispute, and is easily summarized. Pursuant to subdivision (a)(1) of section 388: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made . . . ." (See also *In re Brandon C.* (1993) 19 Cal.App.4th 1168, 1172; Cal. Rules of Court, rule 5.570.) To prevail on a motion under section 388, the petitioner must establish by a preponderance of the evidence (1) that a change of circumstance or new evidence exists, and (2) that the proposed modification would promote the best interests of the dependent child. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) Although the specific factors that a court must consider under section 388 to determine a minor's best interests will vary with each case, relevant considerations include: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually

---

[8] We consider John R.'s argument regarding inaccuracies in the reporting of visitation between himself and the minor in section IID, *post*.

has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 (*Kimberly F.*); see also *In re Angel B.* (2002) 97 Cal.App.4th 454, 463-464.)

On appeal, we will not disturb a juvenile court's determination under section 388 unless an abuse of discretion is clearly established. (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1704.) When reviewing a juvenile court order for abuse of discretion, the " 'appropriate test . . . is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 272; *Stephanie M., supra,* 7 Cal.4th at pp. 318-319, quoting *Walker.*) Accordingly, we will not reverse a juvenile court's denial of a 388 petition " 'unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations.]' " (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421-422 (*Geoffrey G.*); *Stephanie M., supra*, 7 Cal.4th at p. 318, quoting *Geoffrey G.*) Given this high standard, it is a rare situation when the denial of a motion pursuant to section 388 will merit reversal. (*Kimberly F., supra,* 56 Cal.App.4th at p. 522.)

Our review of these proceedings leads us to the inescapable conclusion that this is not one of those "rare situations" where reversal is warranted. John R. filed his 388 petition in August 2013, seeking reinstatement of reunification services based on his progress in an outpatient substance abuse treatment program, which included anger management and parenting classes as well as housing assistance and case management services. By the time the contested matter was heard on October 9, 2013, John R. had completed the nine-month outpatient program and was in the third and final month of his aftercare program. In addition, he had attended parent education classes in connection with his substance abuse treatment and was "pretty close" to obtaining housing with assistance received through the Shelter Plus Care program. However, while substance abuse treatment, parent education, and maintenance of stable housing were all components of John R.'s reunification plan and his progress in that regard is laudable, the

12

crux of these dependency proceedings—as John R., himself, repeatedly stresses—involved the scope of John R.'s mental health issues and their impact on Joshua's safety.

With respect to this crucial issue, the simple fact is that—at the time of the contested hearing on his petition for modification almost two years after the filing of this dependency action—John R. had still not participated in *any* mental health treatment. Rather, he had ignored numerous mental health referrals while the case was pending in San Francisco. He had failed to follow through with a San Joaquin County referral when he was living in Stockton, stating that he was unable to participate in counseling because his life was "not stable." And he had rebuffed multiple attempts by his Bureau social worker to engage him in mental health treatment after he moved to Richmond, including immediate services at a walk-in mental health clinic. At the time of the 388 hearing, John R. had been referred to Life Long Medical Center for a comprehensive mental health assessment where there was a two-month wait for services. It was proposed that he would meet with his substance abuse case manager on a weekly basis in the interim to deal with any "urgent mental health issues." As the Bureau social worker opined: "What [John R.'s] done is when he's—he's switched—now he's saying he'll go to Lifelong, before he was saying he would get it through Highland and it never seems to happen. I think for some reason he doesn't want to do an assessment."

The juvenile court identified John R.'s complete failure to engage in the mental health assessment and treatment component of his reunification plan as the most important reason for denying his section 388 petition. We agree. While he had made "some progress" in addressing a substance abuse problem which, by his own admission, dated back over 25 years, the scope of his mental health issues and their possible impact on Joshua remained entirely unexplored and completely untreated. Thus, with respect to this key circumstance, as the juvenile court recognized, "nothing has really changed."

13

There was therefore no abuse of discretion in denying John R.'s request for modification.[9]

## C.    *Wishes of the Minor*

Subdivision (h)(1) of Section 366.26 provides that, at all permanency planning hearings, "the court shall consider the wishes of the child and shall act in the best interests of the child." John R. next argues that the juvenile court's order terminating his parental rights at the permanency planning hearing on October 9, 2013, is fatally flawed because the court failed to consider Joshua's wishes regarding adoption as required by subdivision (h)(1). For purposes of this statute, evidence of the child's wishes need not be in the form of direct testimony, but may be found in court reports prepared for the hearing. (*In re Amanda D.* (1997) 55 Cal.App.4th 813, 820 (*Amanda D.*).) Moreover, the juvenile court must only consider the child's wishes to the extent those wishes are ascertainable, as a child may not be able to understand the concept of adoption. (*In re Joshua G.* (2005) 129 Cal.App.4th 189, 201.)

Division three of the First District has previously interpreted the mandate contained in subdivision (h) as requiring that the juvenile court "receive direct evidence of the children's wishes regarding termination and adoption" and that the children be "aware that the proceeding involves the termination of parental rights." (*In re Diana G.* (1992) 10 Cal.App.4th 1468, 1480.) Numerous subsequent decisions, however, have rejected this strict reading of the statute. (See, e.g., *In re Julian L.* (1998) 67 Cal.App.4th 204, 208-209 [Second Dist.]; *Amanda D., supra,* 55 Cal. App.4th at p. 820 [Fourth Dist.]; *In re Leo M.* (1993) 19 Cal.App.4th 1583, 1591-1593 (*Leo M.*) [Fifth Dist.].) Under these later precedents, all that is required is that the juvenile court strive, where possible,

---

[9] Since we conclude that John R. failed to establish changed circumstances sufficient to support the grant of his petition under section 388, we need not determine whether reinstatement of reunification services would have promoted Joshua's best interests under the factors set forth in *Kimberly F.* In this regard, we note only that John R. significantly minimizes the magnitude of the mental health concerns that led to the filing of the dependency petition in this matter, including the actual and serious risk of harm that they created for Joshua.

14

"to explore the minor's feelings regarding his/her biological parents, foster parents, and prospective adoptive parents, if any, as well as his/her current living arrangements . . . so that the court will have before it some evidence of the minor's feelings from which it can then infer his/her wishes regarding the issue confronting the court." (*Leo M., supra,* 19 Cal.App.4th at p. 1592; see also *Amanda D., supra,* 55 Cal.App.4th at p. 820.)

At the time of the permanency planning hearing in this case, Joshua was a developmentally delayed eight-year old, with specific challenges in his ability to understand and process information. His ADHD impacted his ability to focus, and he was a special education student and regional center client. He had lived with his grandparents for twenty-two months, consistently reported that he liked living with them, called them mom and dad, and appeared happy in his placement. Moreover, Joshua was reported to be bonded to his grandparents and looked to them rather than John R. for "support, housing, comfort[,] structure, and guidance." In addition, while the record does not contain an express statement regarding Joshua's feelings about adoption, it does memorialize an April 2013 incident where the minor refused to be transported for a visit with his father. Specifically, Joshua ran around his school playground for an hour confused and crying before he could be calmed, contained, and picked up by his grandmother. He later told the social worker that he had mistakenly thought that he was being removed from his grandparents' home. Finally, at the October 2013 permanency planning hearing, Joshua's attorney argued in favor of termination of parental rights based on Joshua's special needs, including his need for stability. Given his attorney's stated position, and absent any evidence in the record to the contrary, the juvenile court could have properly concluded that Joshua—"assuming he had the capacity to reason and form an intelligent preference—did not have a contrary wish." (Compare *In re Jesse B.* (1992) 8 Cal.App.4th 845, 853[holding that, absent contrary evidence, a minor's wish to be adopted could be inferred from his attorney's argument supporting termination of parental rights, since counsel was statutorily obligated under subdivision (e) of section 317 to interview and ascertain the wishes of his minor client].)

15

Thus, significant evidence exists in the record from which it could be inferred that, at the time of the permanency planning hearing, Joshua wanted to remain in the home of his grandparents. Ultimately, however, we need not determine whether this evidence of Joshua's wishes is sufficient for purposes of subdivision (h)(1) of section 366.26. Rather, we conclude that John R. is precluded from pressing the matter on appeal since he failed to object on this basis in the juvenile court. (See *Amanda D., supra,* 55 Cal.App.4th at pp. 819-820; see also *G.C., supra,* 216 Cal.App.4th at pp. 1398-1399; *Crystal J., supra,* 12 Cal.App.4th at pp. 411-412; *In re Riva M.* (1991) 235 Cal.App.3d 403, 411-412.)

**D.**     ***Beneficial Relationship Exception***

John R. finally contends that—rather than terminating his parental rights—the juvenile court should have applied the "beneficial relationship" exception to block the adoption of the minor. At a permanency planning hearing, the juvenile court is charged with determining the most appropriate permanent plan of out-of-home care for a dependent child that has been unable to reunify. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50 (*Casey D.*).) As the most permanent of the available options, adoption is the plan preferred by the Legislature. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) Thus, if a court finds that a child is likely to be adopted if parental rights are terminated, it *must* select adoption as the permanent plan unless it finds a "compelling reason for determining that termination would be detrimental to the child" due to one or more of the "*exceptional circumstances*" specified by statute. (§ 366.26, subd. (c)(1)(B); *In re A.A.* (2008) 167 Cal.App.4th 1292, 1320.)

A single statutory exception is implicated in the present case—where termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parent bears the burden of proof on both of these prongs: (1) that visitation was consistent and regular; and (2) that the child would benefit from continuing the relationship. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81.) Under the present facts, we conclude that John R. has failed to establish that his visitation with Joshua was consistent and regular. Thus, the juvenile

16

court did not err by refusing to apply the beneficial relationship exception to block the minor's adoption.[10]

The Bureau reports for the 12 month review documented only four visits between John R. and Joshua from April 2, 2012, to December 19, 2012, despite the fact that John had relocated from Stockton to Richmond. These visits apparently took place in June, July, August and December. Indeed, John's own testimony confirmed that, during that timeframe, he had only attended four or five visits with his son. John also testified that he had no telephone contact with Joshua prior to the 12-month December 2012 hearing. According to the social worker, no visits occurred between August and September because John R. told her that his phone was being disconnected and that he would contact her to arrange visits. However, he did not get in touch with the social worker until October 15, 2012.

Thereafter, the social worker reported that—between October 2012 and April 2013—John R. scheduled visits for which he either did not show or failed to confirm. At the permanency planning hearing, John R. testified that, in fact, he had missed "a couple" visits and that he had failed to confirm on at least one occasion and therefore did not visit. Thus, during this period, he only had the single visit in December 2012. John next had a visit with Joshua on April 30, 2012. In May 2012, John R. failed to appear for his scheduled visit. He visited with Joshua again on June 6, 2012. Although John R. challenged the reporting of visits that occurred early in the case while it was being

---

[10] Case law is divided as to the correct standard of review for an order determining the applicability of a statutory exception to termination of parental rights. (See *Autumn H., supra,* 27 Cal.App.4th at p. 576) [applying the substantial evidence standard]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying the abuse of discretion standard]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [applying substantial evidence standard to whether the beneficial parent-child relationship exists; applying abuse of discretion standard to whether that relationship provides a compelling reason to apply the exception].) However, the "practical differences" among these standards of review are not significant (see *Jasmine D., supra,* 78 Cal.App.4th at p. 1351), and, on this record, our conclusion would be the same under any of these standards.

supervised in San Francisco, he did not contest the Bureau social worker's reporting with respect to this post-transfer visitation in any meaningful way.

Finally, according to the maternal grandfather, John R. had their telephone number, but did not call frequently. At the permanency planning hearing on October 9, 2013, John R. testified that he had telephone contact with his son approximately ten times, presumably since the 12-month December 2012 review hearing when he had reported no telephone contact. Thus—even accepting John R.'s version of events—between April 2012 and the October 2013 permanency planning hearing in this matter, John visited with Joshua approximately seven times and had telephone contact with the minor on 10 occasions. Although this paucity of contact may be attributed, in part, to John R.'s temporary move to Stockton, much of it is attributable to John R.'s own actions in failing to stay in contact with the social worker, missing visits, and failing to confirm visits.

Moreover, the record reflects that John R. never did anything proactive to increase the frequency and level of his contact with Joshua so that he could re-establish a parental bond with the minor. At the time of the 12-month review in December 2012, John R. stated that there had been no telephone contact between John and Joshua because the grandparents had not initiated it. And John testified at the permanency planning hearing that, throughout the dependency, he visited with the minor when the social worker called him to set up a visit. There is no evidence in the record that he ever asked that his visits or other contact with the minor be increased; that he requested that any missed visits be made up; or even that he demanded the twice a month visitation to which he was entitled by court order until reunification services were terminated. Moreover, according to the social worker, John R. has never asked Joshua, the social worker, or the minor's caretakers about Joshua's "health, behavior, school progress, medical needs, or how Joshua likes living with his grandparents, etc."—the "usual questions" that would be expected of a father. In her report for the permanency planning hearing, the social worker opined that "[t]here is not a significant father and child relationship due to lack of contact and the lack of consistent parental focus and care."

18

In its order terminating reunification services at the 12-month review, the juvenile court expressly found that "dad was unavailable" to the minor and that visitation had been somewhat sporadic. While the court acknowledged that distance might have initially made visitation more difficult, it noted that nothing had changed in the two months that John R. was back in town. Further, at the October 2013 permanency planning hearing, the juvenile court concluded that the social worker "got it right" when she stated that " 'Joshua understands that Mr. [R.] is his father and he enjoys visiting with him as a child would an uncle.' " It is his grandparents, however, to whom Joshua looks for " 'support, housing[,] comfort, structure and guidance.' "

We agree with John R. that the social worker reports in this case were not models of clarity when describing the history of visitation between father and child. However, while there may be some dispute regarding the amount and scope of visitation prior to April 2012, the parties essentially agree that, between April 2012 and the October 2013 permanency planning hearing, there were approximately seven visits and 10 phone calls. Even reviewing the record in the light most favorable to John R., we simply cannot conclude that this amounted to consistent visitation and contact sufficient to invoke the beneficial relationship exception to adoption. There was no error requiring reversal of the juvenile court's order terminating parental rights.[11]

---

[11] In *Autumn H., supra,* 27 Cal.App.4th at page 575, the court articulated a test for determining whether a child would benefit from continuing a parental relationship. To succeed under this test, the parents must establish that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." In evaluating this issue, the court must balance "the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Ibid.*) John R. argues that the *Autumn H.* standard improperly stacks the decks in favor of adoption, is contrary to the express language of the statute, and should be modified. ~(AOB 38-43)~ He also claims that, even accepting the standard articulated in *Autumn H.*, he has established the existence of a beneficial parental relationship. Finally, John R. posits that—without knowing more about Joshua's feelings regarding adoption— there is simply insufficient evidence to determine whether the benefits of adoption for Joshua outweighed any benefits from continuing John R.'s parental relationship with the

## III. DISPOSITION

The judgment is affirmed.

_____
REARDON,  ACTING P. J.

We concur:


_____
RIVERA, J.


_____
HUMES, J.

---

minor.  However, our determination that John R. has failed to establish that he regularly visited Joshua obviates the need to consider any of these remaining contentions.