Filed 8/21/15  In re Mia S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re MIA S. et al., Persons Coming Under the Juvenile Court Law. | D067727 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518660A-C) |
| v. | |
| CRYSTAL S., | |
| Defendant and Appellant. | |

APPEAL from findings and orders of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Emily K. Harlan, Deputy County Counsel, for Plaintiff and Respondent.

Crystal S. appeals orders terminating parental rights to her children, Mia S., Angel S., and Christopher S., under Welfare and Institutions Code section 366.26.[1]  She argues the juvenile court erred when it determined the beneficial parent/child relationship and sibling bond exceptions did not apply and terminated parental rights.  We affirm the findings and orders.

## FACTUAL AND PROCEDURAL BACKGROUND

Crystal is the mother of Mia, Angel and Christopher (collectively, the children), who are now ages nine, seven and six years old, respectively.  In April 2013, the juvenile court took jurisdiction over the children and their two younger half siblings.[2]  (§ 300, subd. (b).)  The children had suffered or were at substantial risk of suffering serious physical harm as a result of serious, ongoing domestic violence, and substance abuse. Mia, who was then six years old, said she was often sad, scared and hungry at home. When the social worker asked five-year-old Angel about his home conditions, Angel repeatedly punched his fists into the air to show how his stepfather hit his mother.  He also demonstrated how his stepfather used intravenous drugs by tapping his vein and pretending to insert a needle into his arm.  Mia said her stepfather hit the children with a hanger and a belt, and her mother could not stop him.

The San Diego County Health and Human Services Agency (Agency) placed Mia, Angel and Christopher together in foster care.  The children appeared to be traumatized.

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    The juvenile court terminated parental rights to Crystal's two youngest children in June 2014, and the children were adopted by their paternal aunt and uncle.  (*In re E.D.* (Dec. 30, 2014, D066187) [nonpub. opn.].)

They often hit each other and the foster parents. The children did not appear to have any rules, manners, stability or structure. Angel could be violent. Mia was parentified. She described caring for her baby sister when her mother would not wake up.

Crystal's case plan required her to complete a domestic violence treatment program, participate in counseling and complete a parenting education course. Crystal was chronically late for visits with her children, scheduled appointments and services. She resumed her relationship with the children's stepfather despite a restraining order.

The social worker reported that Crystal was offered visitation with Mia, Angel and Christopher twice a week. The children were happy to see her. They loved her and enjoyed the visits. Crystal tried to spend time with each child. She was patient and loving but did not know how to redirect and discipline the children. Crystal tried to give each child special attention. However, Crystal missed visits and was late to most visits. This pattern traumatized the children, who reacted by hitting and kicking the foster parents. The foster mother said she wished Crystal realized how sad it was for the children when Crystal was late for visits or did not show up.

In November 2013, the social worker spoke to Crystal about making a consistent effort to visit the children regularly and arrive promptly. All three children hoped to return home. In an effort to provide more consistent visitation, the social worker made a referral to a visitation center. However, after unsuccessfully telephoning the center once, Crystal did not follow through and visits were not set up at the center until February 2014.

Crystal did not comply with the social worker's instructions concerning visitation. On Christmas Day 2013, the foster mother and the children arrived early for a visit. Crystal arrived with Angel's alleged father, Jerry G. The social worker had instructed the foster mother that Crystal was not to bring anyone with her to visits and if Jerry wanted to see Angel, he needed to first speak to the social worker. Crystal and Jerry walked towards the foster mother's car carrying presents. To avoid any problems, the foster mother drove away with the children. Crystal yelled and called the foster mother a "bitch."

After that incident, Angel's behaviors deteriorated. He hit his best friend and his foster parents in the face. He kicked his foster parents, pulled their hair and threw objects. He said he wanted to kill someone and started to cut up his new clothing and to break toys. In February 2014, after Angel began to scratch and hit Mia and Christopher, the Agency placed him in a foster home where he could receive one-on-one care and intensive behavioral services.

When Angel left, Mia said she was sad but it was for the best because he was hurting her and the other children. Christopher, who had been doing well, regressed, mimicking Angel's aggressive behaviors. The Agency reinstated Christopher's behavioral therapy. The children continued to have a lot of contact with each other. Mia and Angel attended the same school and the foster care parents used each other for respite care for the children.

At the 12-month status review hearing, the social worker recommended the court terminate services and set a section 366.26 hearing. The social worker reported visitation

continued to be supervised because Crystal did not comply with her services and lacked parenting skills. The foster mother showed her how to calm the children. After visits, all three children displayed behavioral problems. The social worker reported that Crystal had visited the children approximately six times at the visitation center. She arrived on time to the visits and brought food and drinks. She was affectionate with the children, and they with her. Crystal was able to redirect the children when they had tantrums. She missed two visits, one in March and one in April.

When Mia and Christopher's foster mother offered to facilitate additional visits, Crystal was not cooperative. When visits were scheduled, Crystal showed up late or stayed for only 30 minutes. On March 26, she did not show up or call to cancel a scheduled visit. In April, Crystal attended church services with Angel and his foster care family. She promised Angel she would come to church every week with him. Crystal did not keep her promise. Angel was very upset about the broken promise. He hit and kicked his foster mother. She heard Angel repeatedly say, "I'm done with this." On May 28, the foster mother took Mia out of soccer practice to visit Crystal, who did not show up. Mia became upset and started to hit other children.

The social worker said she was extremely concerned about Crystal's lack of insight into her children's behavioral issues and the impact caused by the severe trauma they suffered as a result of her relationship with an abusive partner. Crystal blamed others for her own mistakes. She did not make enough progress to justify unsupervised visitation. The children remained emotionally fragile and needed caregivers they could trust. The

5

juvenile court terminated family reunification services to Crystal and set a section 366.26 hearing.

In her initial court report, the adoptions social worker (social worker) said Mia and Angel understood the concept of adoption. They wanted to return to their mother and did not want to be adopted. Mia said she wanted her mom to always be her mom. Angel's foster parents and Mia and Christopher's foster parents were not willing to adopt them. Crystal was consistently visiting the children two hours a week. When the children saw her, they ran to her and hugged her. The visits were fun for the children. The social worker asked for a continuance of 75 days to assess the children's adoptability.

The contested section 366.26 hearing was held on March 5, 2015. At that hearing, the social worker reported that Mia and Christopher had been placed in a potential adoptive home in October 2014. They were doing well and appeared to be much happier than they were in the previous placement. Mia was generally adoptable. Although she was loyal to her mother and was sad that she could not live with her, Mia said she would be "very very very happy" to live with her current family. She wrote her name with the caregivers' last name and told them "if you adopt me my name will be Mia [O.]."

The social worker said Christopher was generally adoptable. He presented as a confused and scared little boy. On one visit, he curled up in Crystal's lap for comfort when he had a stomach ache. He was also very affectionate with his caregivers. During a visit, Christopher told Crystal she was not his mom, he had a new mom. Crystal was hurt and upset. She said, "No, I will always be your mom" and explained that he grew into a baby in her tummy. Christopher sighed and said, "Ok, ok, you are my mom." On

6

another occasion, when the caregiver reminded Christopher he had a visit with his mother that day, he said, "What? We have another visit? I thought they were done already."

Angel had a difficult time after his siblings were placed in a potential adoptive home and no longer attended school with him. In December 2014, the Agency identified a possible adoptive home for Angel. The social worker talked to Angel about adoption and explained she wanted to find a family to love and take care of him forever, just like the family that was taking care of Mia and Christopher. Angel said "yes" with a big smile. Angel dressed up for his first visit with his new caregivers and spent Christmas with them. He began living with them in January 2015.

The social worker said Crystal loved her children and they loved her and were attached to her. They played games and enjoyed each other's company. However, the children did not respond when Crystal redirected them. The visitation monitor had to intercede when Angel and Christopher were engaging in potentially risky activities such as playing in the parking lot or climbing on a rail. On one visit, Mia tripped and would not allow her mother to console her. On another visit, Angel would not allow Crystal to hold him and moved away when she lay down next to him. Crystal told the children they would be returning to live with her soon. They returned from visits tense and deregulated.

The social worker recommended the juvenile court terminate parental rights. Although the children's court-appointed special advocate (CASA) initially concurred with the social worker's recommendation, at the section 366.26 hearing the CASA said

terminating parental rights at that point in time would irreparably damage the sibling relationships and recommended the children remain in long-term foster care.

The social worker testified she did not agree with the CASA's recommendation. The children's caregivers completed a class on how to enhance sibling relationships when siblings were separated by adoption. They independently facilitated two sibling visits. On one of the visits, the two families spent a day at the park together.

According to the social worker, Mia was doing very well. She was becoming more and more attached to her caregivers. Her school performance and behavior had improved. Mia appeared relieved when told she would live with her current caregivers if adopted. Christopher had been expelled from school. The caregivers provided one-on-one home schooling and he was doing much better. The caregivers were slowly reintegrating him into the school system. The social worker did not talk to Christopher about adoption because he was too young. However, Christopher kept asking his caregivers, "Am I adopted yet?" Angel was doing very well in his new home. He had not acted out. He referred to his new caregivers as "mom and dad." At a visit with Crystal, Angel pretended to be asleep, saying, "Just wake me up when it's over. I want to go home."

In a letter to the court, which was entered into evidence, Crystal said she did not have any support to leave an abusive relationship and stayed because she feared for her life. Every time she saw her children she knew how deep their pain was. She loved and missed them. She was a good mother and nurtured her children. She was not the abusive

parent. Crystal knew her children loved her and would continue to seek her out, as she would them. They yearned for her to be their mommy.

The juvenile court found that Crystal had friendly visits with the children. She loved them but did not offer parental guidance, parental support or parental protection to them. The children turned to their caregivers for love, support and protection. The children clearly had bonded sibling relationships. However, termination of parental rights would not substantially interfere with the sibling relationships because the children's respective caregivers were committed to maintaining the sibling bonds. The juvenile court found that terminating parental rights would not be detrimental to the children under any of the specified statutory exceptions and terminated parental rights.

DISCUSSION

I

*Termination of Parental Rights*

At a permanency planning hearing, the court may order one of three alternatives—adoption, guardianship or long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296-297 (*S.B.*).) If a child is adoptable, there is a strong preference for adoption over the alternative permanency plans. (*Id*. at p. 297; *San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888.) If the court determines that a child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

9

We determine whether there is substantial evidence to support the court's ruling terminating parental rights by reviewing the evidence most favorably to the prevailing party, and indulging in all legitimate and reasonable inferences to uphold the court's ruling. (*S.B.*, *supra*, 164 Cal.App.4th at pp. 297-298; *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)[3]

## A

### *The Sibling Bond Exception Does Not Apply*

Crystal contends the children had "important and significant sibling bonds" with each other that outweighed any benefit they would receive from adoption. She argues the juvenile court erred when it found that termination of parental rights would not substantially interfere with the sibling relationships because the promises by the children's respective caregivers to maintain the sibling relationships were unenforceable.

The sibling bond exception applies where a party proves by a preponderance of evidence that termination of parental rights would substantially interfere with a child's sibling relationship. (§ 366.26, subd. (c)(1)(B)(V).) In determining whether this exception applies, the court considers "whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing

---

[3]     The Agency urges this court to discard the long-established standard of review for termination of parental rights and instead adopt a hybrid standard of review. We need not address this issue because the record supports the juvenile court's findings and orders under either standard.

close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*Ibid*.; see *In re Valerie A*. (2007) 152 Cal.App.4th 987, 1007 (*Valerie A*.).)

Crystal argues the siblings' relationships were significant. We agree. The juvenile court found, and the record clearly shows, that the siblings have close, bonded relationships with each other. However, Crystal misstates the law concerning postadoptive sibling contact. In addition, she presents only a conclusory argument concerning balancing of children's interests in their sibling relationships with the benefits they would gain through adoption.

"Unlike the parent-child relationship, sibling relationships enjoy legal recognition after termination of parental rights." (*S.B., supra*, 164 Cal.App.4th at p. 300; *In re Valerie A*. (2006) 139 Cal.App.4th 1519, 1524; *In re Miguel A*. (2007) 156 Cal.App.4th 389, 396.) Section 366.29, subdivision (a), provides in relevant part, "With the consent of the adoptive parent or parents, the court may include in the final adoption order provisions for the adoptive parent or parents to facilitate postadoptive sibling contact." After the adoption is final and the jurisdiction of the juvenile court has been terminated, the court granting the adoption petition maintains jurisdiction over the child for enforcement of the postadoption contact agreement. (§ 366.29, subd. (c).) The juvenile court did not abuse its discretion when it considered the caregivers' willingness to

11

facilitate postadoptive sibling contact.[4]  The children's current caregivers recognized the value of the children's sibling bond and were willing to, and did, facilitate the siblings' bonds.  Thus, the record supports the finding that Angel will have "ongoing contact" with Mia and Christopher and termination of parental rights will not substantially interfere with the sibling relationships.  (§ 366.26, subd. (c)(1)(B)(V).)

In assessing the interests of the children in maintaining their sibling relationships, the juvenile court is required to determine "whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."  (§ 366.26, subd. (c)(1)(B)(V).)  Crystal asserts, without discussing the children's long-term emotional interests, that the sibling relationships outweighed the benefits of adoption.

Here, even if, as Crystal contends, the record did not support a finding the caregivers would facilitate "ongoing contact" between the siblings, there is substantial evidence to support the juvenile court's findings that each child's long-term emotional interests were better served through adoption than by placement together in foster care. Mia and Christopher are placed together and adoption will not impair their bond with each other.  At issue are their relationships with Angel and Angel's relationships with them.  The children were placed together in foster care for almost a year.  The Agency reluctantly moved Angel after he started to physically assault his siblings.  Angel required one-on-one care and attention.  Although his behaviors deteriorated when Mia

---

4    We also note the children are old enough to independently maintain contact through telephone calls and social media.

12

and Christopher were placed in a potential adoptive home and he no longer saw them at school, his behavior and emotional stability greatly improved when he was placed in a home in which he felt wanted, safe and secure. The record supports the conclusion that in view of Angel's dysfunction when living with his siblings in foster care and his happiness and ease with his new caregivers, his long-term emotional interest is better served by adoption. Mia and Christopher, although they missed Angel, were doing very well and gaining a sense of permanence and stability in their new home that they did not have in foster care with Angel.

This court has consistently stated that "the application of [the sibling bond] exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*Valerie A.*, *supra*, 152 Cal.App.4th at p. 1014.) Mia, Angel and Christopher were exposed to domestic violence, substance abuse, filthy home conditions and neglect. Their long-term emotional interests are better served by having a permanent, stable home and becoming members of a stable family than a tenuous placement in foster care. Even if termination of parental rights would result in severing Angel's relationships with Mia and Christopher, a conclusion not supported by the record, the record shows that each child's long-term emotional interest would be better served by having a permanent home with capable parents than by having ongoing contact. The court did not err when it found that the sibling bond exception did not apply. (§ 366.26, subd. (c)(1)(B)(V).)

B

*The Beneficial Parent/Child Relationship Exception Does Not Apply*

Crystal asserts the court erred when it determined the beneficial parent-child relationship exception did not apply. She contends Mia, Christopher and Angel had strong, positive and significant emotional attachments to her, and Mia voiced her opposition to adoption on numerous occasions.

An exception to termination of parental rights applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "Evidence of 'frequent and loving contact' is not sufficient to establish the existence of a beneficial parental relationship." (*In re Bailey J*. (2010) 189 Cal.App.4th 1308, 1315-1316.) " '[B]enefit from continuing the . . . relationship' " means that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid*.)

The juvenile court found that Crystal and her children loved each other but she was unable to provide "parental guidance, parental support and protection" to them. The record shows that Crystal did not consistently offer Mia, Angel and Christopher the care, comfort and affection they needed from a parent. Her visits with the children during the

first six months they were in foster care were sporadic. Her weekly visits with the children became more consistent after they were moved to the visitation center, but she did not take advantage of more frequent visits that were offered to her. The children enjoyed her visits, but her inconsistent visitation was emotionally detrimental to the children throughout the proceedings. When she broke her promise to Angel to attend church with him, Angel was emotionally traumatized, repeatedly saying, "I'm done with this." When Crystal did not show up at a visit that required Mia to cancel her soccer practice, Mia became upset and reacted by hitting other children.

"The positive and negative effect of interaction may be shown by such things as, despite regular visitation by the parent, the fact that a child repeatedly expresses that he or she does not want to visit the parent (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1155), and unhappiness and acting out by the child related to parental visits. (*Ibid.*) Indifference to a parent, anger or detachment are also factors indicating the lack of the necessary positive relationship. (*In re Amanda D.* (1997) 55 Cal.App.4th 813, 822.)" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. 4.) The record shows that the children displayed indifference, detachment and acting out after visits with Crystal. During a visit, Angel pretended to be asleep, saying, "Just wake me up when it's over. I want to go home." He refused to allow Crystal to hold him and moved away from her. When reminded he had a visit with his mother, Christopher said, "What? We have another visit? I thought they were done already." On one visit, Mia tripped and would not allow her mother to console her.

By the time of the section 366.26 hearing, the children looked to their current caregivers to fulfill their emotional and primary needs. The social worker said the children were thriving with their potential adoptive families. They had gained a family structure, a sense of safety, and stability with their new caregivers. Angel called his caregivers "mom" and "dad" and talked about his "new family." Although Mia was sad about not being able to live with her mother, she said she would be "very very very happy" to live with her current family, and started writing her name using the caregivers' last name. Christopher kept asking his caregivers, "Am I adopted yet?" He told Crystal she was not his mother and he had a new mother.

There is substantial evidence to support the finding that termination of parental rights would not be detrimental to Mia, Angel and Christopher, and they would greatly benefit from the security of a stable, permanent home with committed, capable adoptive parents. (§ 366.26, subd. (c)(1)(B)(i); *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) The record supports findings that the children will not be greatly harmed by termination of parental rights. (*Autumn H.*, at p. 575.)

## DISPOSITION

The findings and orders are affirmed.


IRION, J.

WE CONCUR:


HALLER, Acting P. J.


O'ROURKE, J.

16