Filed 8/25/21  In re C.S. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re C.S., et al, Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G059993 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 18DP1069 & 18DP1070) |
| v. | |
| GUADALUPE C., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Jeremy Dolnick, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen, and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

The court terminated Guadalupe C.'s (Mother) parental rights to her two children C.S. and A.C., following a Welfare and Institutions Code section 366.26 permanency hearing (permanency hearing).[1]  Mother asserts the court abused its discretion when it declined to apply the parent-child beneficial relationship exception (benefit exception) to the termination of parental rights.  We affirm the judgment.

FACTS

In early October 2018, the Orange County Social Services Agency (SSA) took C.S. and A.C. into protective custody after Mother and A.C. tested positive for methamphetamine after A.C.'s birth.  A.C. required treatment in the hospital's Neonatal Intensive Care Unit, having symptoms of high temperatures, excessive sleeping, and episodes of irregular breathing.  Because she had difficulty feeding, A.C. needed a nasogastric tube in her nose for nutrients.  Mother self-reported using methamphetamine during her pregnancy and admitted she did not receive any prenatal care.[2]

SSA's original petition alleged, under section 300, subdivision (b)(1), that the parents had unresolved histories of substance abuse, domestic violence, and criminal activity that posed a risk of harm to the children.  The petition alleged Mother may have unresolved/untreated mental health issues.  The paternal grandmother (Grandmother) reported Mother hit herself while pregnant with C.S. and once pushed C.S. into the street so he would be hit by a car.  Furthermore, the parents lacked safe and stable housing.  Mother self-reported she had been sleeping in a van parked outside Grandmother's home.

The petition asserted Father filed a restraining order protecting himself, Grandmother, and C.S. from Mother, who had previous arrests for violent offenses.  In addition, Grandmother had cared for C.S. since his birth one year ago (October 2017).

---

[1]        All further statutory references are to the Welfare and Institutions Code.

[2]        The children's father (Father) is not a party to this appeal, and we limit our recitation of the facts accordingly.

Grandmother reported Mother and Father initially lived with C.S. in her home. However, she evicted Mother in January 2018, after she left C.S. unattended for several hours while Mother went out looking for drugs. She later evicted Father after he failed to find employment or provide care for C.S. Grandmother suspected he was using drugs with Mother.

After SSA detained the children, the court ordered six hours of supervised visitation each week. For six months, neither Mother nor Father visited their children.

Before the jurisdictional hearing, the social worker reported Mother had a five-year history using methamphetamine and completed a substance abuse treatment program when she was 19 years old. Mother claimed she was sober for two years before using methamphetamine around the time of A.C.'s birth, which she conceded was a mistake. The social worker reported the children's half sibling H.C. was declared a dependent of the court in February 2014 due to general neglect. The court terminated family reunification services in 2017 and H.C.'s paternal grandparents were now her legal guardians.

The social worker opined Grandmother was a good caregiver for C.S., but SSA removed him from her home because a relative residing there had a family maintenance case plan. Grandmother stated that due to her age it would be in C.S.'s best interests to be placed with his paternal uncle who resided in Victorville, California. SSA agreed with this assessment and placed C.S. with his paternal uncle and aunt in Victorville and sent A.C. to live with non-related extended family members in Bakersfield, California.

In November 2018, the court proceeded with the dependency case in the parent's absence and assumed jurisdiction over the children. A few months later, Mother did not appear for the disposition hearing and the court denied her reunification services. The court offered Father reunification services as to C.S. and scheduled a permanency

3

hearing for A.C.  The court ordered visitation, reducing the hours from six to four hours per week.

I. *A.C.'s Permanency Hearing Report*

In early May 2019, the social worker prepared a report for A.C.'s permanency planning hearing.  A.C. (then seven months old) was thriving with her caregivers.  She was making positive developmental strides and had overcome some of the negative effects of having methamphetamine in her system.  A.C. and her caregivers developed a strong bond, and they wished to adopt her.  The social worker noted Mother did not "make herself available" for the court-ordered visits (six hours per week) and would not return the social worker's telephone calls.  Although Mother had one visit with A.C. in mid-April 2019, her whereabouts had been unknown for most of A.C.'s life.

Mother contacted the social worker on March 13, 2019, to report she had been sober for 45 days and she completed a parenting program.  Mother stated she was in the process of completing an anger management program through American Recovery Center in Pomona.  The social worker noted Mother did not have any documentation or negative drug test results to support her claims of sobriety.

The social worker opined, "Overall, it would appear that although [Mother] is making some undocumented progress, she . . . remains in a residential treatment program, is not yet working, and has an unresolved anger management history wherein her criminal history gives light to her personal anger issues.  [¶] In light of the aforementioned, it does not appear [Mother] is truly committed to the child.  She has not remained in the life of the child, nor did she make any attempts to have visits with the child until March 2019.  Even then, she did not follow through in arranging a visit until April 2019. . . . Meanwhile, [A.C.'s] life has gone on without her mother or father being involved . . . and she is placed in a family that has been by her side, day in and day out. They have ensured that she visits with the doctor, have been there when she is sick, and have embraced her as if she was their own.  They have given of themselves for the

4

betterment of the child that they have come to love so dearly. [¶] Therefore, the undersigned respectfully recommends [the court terminate parental rights allowing the child to be] freed for adoption and to have a stable and loving home."

The court continued A.C.'s permanency hearing until May. Meanwhile, Mother filed a section 388 petition to reinstate reunification services with both children. This prompted the court to continue A.C.'s hearing until the end of June.

II. *Six-Month Review Hearing for C.S.*

At the end of June 2019, the social worker prepared a six-month review hearing status report concerning C.S. The social worker noted that during this past period of supervision, Father failed to make progress on his case service plan and was incarcerated for a felony. The social worker recommended termination of his services and that the court schedule a permanency hearing for C.S.

Mother's first visit with C.S. was in March 2019, and she left the scheduled visit early. Due to the distance between Mother and C.S., the caregivers arranged for visits at a halfway point. Mother would also sometimes have unscheduled visits with C.S. when the caretakers went to visit Grandmother. The social worker concluded Mother needed to work on mitigating the factors that brought C.S. into the custody of the court and to visit C.S. regularly. She interacted well with C.S. and performed parental tasks. The social worker added that C.S. was doing well in the care of his paternal aunt and uncle. She observed C.S. bonding with his caregivers. They were willing to adopt him.

The social worker noted Mother had recently also begun visiting A.C. every other week. Mother had been asking the caregivers for food and ending visits two hours early because the baby was "fussy." A.C.'s caregivers noted Mother became anxious when the baby was fussy or would not feed easily from the bottle. Mother dropped what appeared to be a vape pipe on the floor during one of the visits.

5

The court continued the hearings scheduled for the children's cases to be heard the same time as Mother's section 388 petition. The social workers filed addendum reports in both cases. One social worker noted that after two shortened visits in March, Mother did not visit C.S. until the end of May and then once in mid-June. The social worker expressed concern Mother "was not visiting consistently with the child to establish and maintain a bond with the child."

### III. *July 2019 Hearing–Start of Mother's Services*

At the six-month review hearing, held at the end of July 2019, the court considered Mother's section 388 petition. The social workers filed addendum reports recommending the court grant Mother's petition because her two most recent visits with the children had gone well. After considering Mother's testimony, the court granted Mother's request for reunification services and scheduled a 12-month review hearing.

### IV. *12-Month Review Hearing*

In September 2019, the social worker submitted a report regarding both children (C.S. was nearly 2 years old, and A.C. was 11 months old). Mother continued to visit with C.S and A.C., although the social worker voiced concern the contact was not consistent "which will prevent [Mother] from bonding with the children." Mother's visits with C.S. were more positive than those with A.C. Mother was employed and working on services, however, she struggled to demonstrate her sobriety. The court continued the hearing to November 2019.

In an addendum report prepared in November 2019, the social worker recommended the court terminate reunification services and schedule a permanency hearing for both children. The caregivers for both children agreed to meet Mother for visits at halfway points to help Mother. The social worker reported that for the past two months, Mother "maintained a positive and consistent relationship" with her children. However, Mother, who was employed part-time at a restaurant, relied on public transportation to go to work and comply with case plan services. The social worker noted

6

Mother's changing work schedule sometimes interfered with her ability to visit. Mother's schedule would change with as little as a day's notice. Mother told the social worker this was the reason why she missed several visits with C.S. in October and that "the fires" stopped her from visiting A.C.

The social worker included information provided by visitation monitors. During a visit in August 2019, Mother constantly checked the time "as if waiting for the visit to end" and left one hour early. When A.C. became fussy, Mother gave the child to the caretaker's family and appeared to have no patience with A.C. It was reported that Mother was not trying to interact with A.C. during visits, and she failed to call or text to check on how her child was doing. The social worker reported there were "concerns [Mother was] not bonding with [A.C.] and [was] not making an effort to create a bond with the child." A different monitor offered a similar opinion following three visits in September. Mother was described as not being affectionate and wanting A.C. to sleep the entire time. She cancelled visits stating she was too tired. During one visit in September, A.C. became sick and her caretakers took her to the emergency room when the visit was over. Mother did not offer to join them at the hospital. She did not later inquire if A.C. felt better. In October, A.C.'s caregiver had a one-year-old celebration and stated she was disappointed Mother did not wish A.C. a happy birthday or ask how she was doing.

Mother's visits with C.S. were inconsistent but more positive. The caregivers reported that although Mother missed many visits, she would FaceTime with him three times per week for a few minutes.

The social worker stated Mother had "made no efforts to resolve the issues and concerns sustained in the petition." She noted Mother "minimally participated" in her case plan, she "tested positive for all [drug patch] tests, visited sporadically, and lacked meaningful participation and affection during visits. She opined the prognosis for reunification was minimal because Mother continued "to show lack of motivation and

7

effort" to obtain sobriety and had "failed to prioritize her visitation with the children" resulting in minimal contact with them.

The court continued the hearing several times. In preparation for a hearing scheduled for February 2020, the social worker prepared an addendum report. She observed Mother during some visits with the children. She stated her recommendation to terminate services remained unchanged. Mother was participating in her case service plan. She was testing negative and starting therapy. The social worker wrote that in regard to visitation, she and another social worker observed Mother "to be overwhelmed with managing the children's behavior." She stated the following: "[M]other places effort in presenting herself to the visits but does not plan accordingly to arrive on time and be prepared for the visits by having adequate provisions for the children. On the other hand, [M]other praised the children appropriately and displayed age appropriate affection with the children during the visits." The court continued the matter to April 2020.

In her April addendum report, the social worker stated Mother was visiting C.S. on Wednesdays and A.C. on Saturdays. There were plans to arrange a joint visit with both children. The social worker attended a supervised visit with A.C. and expressed concern after seeing Mother was not attentive and she struggled to soothe A.C. (then 16-months old). The social worker added, Mother was "not patient with [A.C.] and [did] not take criticism well."

A.C.'s caretaker noted Mother, "still struggles to have an actual bond" with A.C. and she was not really interactive with her. The caretaker observed Mother typically kept A.C. in her stroller during visits and tried to keep her sleeping. The caretaker added, Mother's attitude and behavior around the children changed when she was being monitored by the social worker. She believed Mother was not making enough effort to change or do better during visits.

8

The social worker reported she observed Mother's visit with both children at the end of February 2021. She saw Mother attempted to be active with her children, but in doing so she was not able to provide appropriate safety measures for both. For example, sometimes when Mother engaged with C.S. she left A.C. unattended in places the baby could fall. Mother relied on items provided by the caregivers for the children's needs. The social worker opined Mother exhibited minimal affection and spoke to the children "directly without a nurturing tone."

V. *Proceedings During the Covid-19 Pandemic Shut Down*

On April 1, 2020, the date set for a combined 12- and 18-month review hearing, the juvenile court ordered the matter continued due to the Covid-19 pandemic. In 2020, the court ordered multiple continuances for the same reason on May 7, June 22, August 10, August 20, and September 10.

SSA continued to file reports during this period, noting the pandemic interfered with Mother's ability to see her children. In May 2020, the social worker wrote Mother reported she was calling A.C. every two days to speak with her using video calls. Mother mentioned the calls do not last very long (approximately six minutes) because of A.C.'s age and ability to stay engaged. Mother said she used video calls to visit with C.S. every Wednesday. She reported these calls were "'easier'" and lasted longer (5 to 10 minutes) because her son talks and shared information with her.

In the social worker's next report, filed at the end of June 2020, Mother stated she called the children once a week, but the time had not increased because "the children are distracted easily." A.C.'s caregiver stated Mother usually asked to see the child but did not ask any questions about her development, what she does during the day, or engage with her. The caregiver mentioned Mother never called her to ask about A.C. on non-visitation days. At the end of May, the caregiver reported A.C. did not recognize Mother on the phone.

C.S.'s caregiver told the social worker that Mother tended to call without scheduling a visit, and if C.S. was asleep or unavailable, Mother would not call back. The caregiver told Mother that C.S. would be available anytime during the day until 3:00 p.m., when he will be more alert and able to engage in the call. However, Mother consistently called after 5:00 p.m. The social worker reported Mother was working on her case plan but had tested positive for cocaine. The social worker stated this relapse stopped plans, started before the pandemic, to progress Mother towards unsupervised visits.

In early August 2020, the social worker reported she informed Mother all plans for in-person visitation were stalled because the counties of Los Angeles and San Bernardino imposed strict restrictions to stop the spread of COVID-19. Mother continued to visit the children using video calls. She stated C.S. had begun to hide out of the camera's view and would cry, prompting Mother to play a video game on her iPad for him to see. The social worker recommended she try reading with C.S. instead. Mother's calls with A.C. were shorter than those with C.S. Mother typically used her time with A.C. to watch her play rather than interact with her.

The children's caregivers reported Mother was missing calls with the children. A.C.'s caregiver reported Mother missed several weeks, and when she did call, she made no effort to bond with her child. The caregiver stated that when she saw Mother at the end of July, she appeared to be very thin and under the influence of something. When the caregiver asked Mother why she had not called A.C. for a month, she responded she was busy working.

Similarly, C.S.'s caretaker noticed a decline in the frequency of calls and Mother's efforts to engage with her child. The caretaker stated Mother refused to text beforehand to schedule a call, and she usually called when C.S. was napping. The calls lasted approximately 10 to 15 minutes and C.S. initially resisted speaking with Mother. The caregiver noticed C.S. was hiding from the camera. The caregiver stated she tried to

10

redirect C.S. to engage with Mother, who would play videos through her tablet to get his attention. C.S.'s caregiver noted Grandmother believed Mother and Father were back living together. Father borrowed Grandmother's truck and disappeared with Mother for two weeks. Mother vehemently denied these allegations. The social worker concluded by stating Mother claimed to be progressing with her case plan, but she tested positive once for methamphetamine.

At the end of August 2020, the social worker stated visitation had decreased to once or twice a month, and the video calls were short. Mother struggled to engage with her children and admitted she called less due to feeling badly about the quality of the visits. The social worker stated she would resume in person visits as soon some of the pandemic restrictions were lifted.

In September 2020, the social worker noted the quality of Mother's visitation efforts had not improved. The caregivers reported Mother struggled to "engage effectively" with the children. A.C.'s caregiver stated the child (then two years old) had no interest in Mother during the calls. C.S.'s caregiver stated the child (then three years old) was not responsive during calls.

The juvenile court conducted the combined 12- and 18-month review hearing on September 24, 2020. The court determined SSA provided reasonable reunification services, but the parents made minimal progress at alleviating the causes necessitating the children's placement. It terminated reunification services and scheduled a permanency hearing in January 2021. Pursuant to the parties' stipulation, the court ordered SSA to continue providing services to Mother until the permanency hearing date. It determined Mother could resume in-person visits with the children in public locations, with all parties wearing masks. Mother was to have one visit every other week with each child and could also continue with telephone and video calls.

The social worker's January 2021 report stated Mother had a positive test result for methamphetamine in mid-December. Mother and Father were involved in a

11

domestic violence incident at the end of December. The social worker stated that when she told Mother her visit on December 16 would be cancelled due to A.C.'s recovery from a tonsillectomy. Mother responded by stating that because she had "so much going on" she forgot about it. Mother admitted she had not asked the caregiver about A.C.'s recovery or scheduled a virtual visit with her child. She indicated she would call soon to see how A.C. was doing.

Mother resumed her separate in-person visits with each child twice a month (each visit lasting five hours). The social worker reported Mother visited but still failed to ask about her children's well-being.

The social worker recommended termination of parental rights and a permanent plan of adoption. Each child had lived with their caretakers for over two years (since November 2018). The children were healthy and developmentally on target. Their caregivers wanted to adopt them.

The court continued the hearing to March 2021. The social worker prepared an addendum report in March, stating Mother missed visits in January because she tested positive for COVID 19. The social worker offered Mother virtual visits, but Mother failed to contact the caregivers. Thereafter, Mother missed visits because she was incarcerated due to an outstanding warrant.

VI. *Permanency Hearing*

On March 8, 2021, the court held the permanency hearing and considered Mother's argument the court should apply the benefit exception. The court determined the children were adoptable and that no exception to the statutory preference for adoption applied in this case. The court terminated parental rights and ordered the children placed for adoption.

DISCUSSION

Mother asserts the juvenile court erred by terminating her parental rights. She provides the following argument: "Though [M]other was not able to reunify with

12

[her children] through her court-ordered services, she maintained regular and consistent visitation with them — a process hindered by the Covid-19 pandemic — and did what she could to build her parental relationship with each of them, within the limits of time placed on her by the juvenile court." Mother contends the record "amply shows the challenges" she faced, that she clearly loves her children, and she "sought to maintain her parental connection with them through visitation." She explains a "number of complicating factors inhibited this process," including the children's placement in homes far away from her and she relied on public transportation, the pandemic restrictions, and her work schedule. She concludes that "[g]iven all the factors involved in this case" the court erred in refusing to apply the benefit exception. We disagree. There is a large body of well settled case law holding application of the benefit exception requires more than evidence a parent faced challenges, hardships, and visitation restrictions. What about C.S.'s and A.C.'s best interests?

I. *Benefit Exception*

As recently stated by our Supreme Court in *In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden*), "In interpreting the exceptions, we are guided by the relevant statutory provisions, read in context. [Citation.] In particular, we take account of the connection the statute establishes—when an exception applies—between the 'best interest' of the child and the continuation of parental rights. Parallel to the provision detailing the exceptions [citation], the statute provides that '[i]f the court finds that adoption of the child or termination of parental rights is not in the best interest of the child, *because* one of [those exceptions] . . . applies, the court shall' follow a process to select among permanent plans other than adoption. [Citation.] In other words, when a parent establishes that one of the exceptions applies, adoption or termination is not 'in the best interest of the child.' [Citations.]"

"The exception at issue in this case is limited in scope. It applies where '[t]he court finds a compelling reason for determining that termination would be

13

detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.] From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child. In understanding these elements, we are guided by what has become the seminal decision interpreting the exception, the Fourth District Court of Appeal's opinion in *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*). The court there articulated the meaning of the exception in an opinion that has guided the thousands of Court of Appeal decisions on the exception since. [Citations.] What the appellate court emphasized in *Autumn H.* is a crucial aspect of the trial court's responsibility in these cases: in assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden, supra,* 11 Cal.5th at pp. 631-632.)

II. *Standard of Review*

Appellate courts have offered different opinions about what standard of review to apply to the three elements of the benefit exception. The Supreme Court resolved this issue in the *Caden* case, holding: "We agree with the general consensus: a substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it. [¶] The

14

third element—whether termination of parental rights would be detrimental to the child—is somewhat different.  As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations.  These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be.  The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms.  In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told.  All these factual determinations are properly reviewed for substantial evidence.  [Citation.]  [¶] Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain.  The decision . . . does require assessing what the child's life would be like in an adoptive home without the parent in his life.  [Citation.]  The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home.  And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden, supra,* 11 Cal.5th at pp. 639-640.)

III.  *Visitation & Contact*

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'  [Citation.]  Visits and contact 'continue[] or develop[] a significant, positive, emotional attachment from child to parent.'  [Citation.]  Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' [Citation] but certainly not to punish parents or reward them for good

15

behavior in visiting or maintaining contact—here as throughout, *the focus is on the best interests of the child.* [Citation.]" (*Caden, supra,* 11 Cal.5th at p. 632, italics added.)

Here, the juvenile court stated, "although the argument is COVID got in the way, we have to recognize this case has been around essentially since [A.C.]'s birth . . . [in October 2018] . . . and [we] had all of 2019, and we had the first few months of 2020 to demonstrate regular and consistent contact. When I go back and I look . . . I just don't find that either parent can meet that burden." We conclude the record contains substantial evidence to support the court's conclusion.

Mother started this case lacking a strong emotional connection to either child. This is evidenced by Mother's decision to not seek prenatal care for A.C., and Mother's eviction from Grandmother's home leaving baby C.S. behind, soon after his birth. Grandmother reported she stepped up to become C.S.'s primary caregiver for the first year of his life because Mother would leave the baby unattended when she went out looking for drugs.

It is undisputed Mother did not visit her children for the first six months of this dependency case, a compelling sign of a detachment. In the 11 months before the pandemic, Mother failed to visit her children for weeks at a time, unexpectedly cancelling visits or cutting them short. Although Mother engaged in parental duties, such as changing diapers and feeding her children during visits, the social workers and caregivers consistently described Mother's lack of effort and engagement during visits, as well as Mother's struggles bonding with A.C. Thus, for more than a year pre-COVID, there was little evidence suggesting Mother's visits with her very young children resulted in the formation of a strong emotional parental attachment. At this point, Mother's relationship lacked the depth and quality required for the benefit exception.

We are unpersuaded by Mother's assertion the COVID-19 pandemic restrictions prevented her from "maintain[ing] her parental connection." We acknowledge video visits are generally a poor substitute for in person visitation.

16

However, if Mother had, within the prior year and one-half, managed to cultivate a stronger emotional bond with her young children, then frequent video calls would have been helpful in enforcing those established familial ties. For the sake of argument, if we accepted Mother's claim, she successfully started cultivating a relationship with her children, then the record shows she squandered the opportunity to reinforce those new bonds. She did not take advantage of all the available video calls, which given the unique circumstances of life during the pandemic, further demonstrates Mother's lack of emotional connection to her children. The pandemic restrictions meant Mother's children were isolated from the outside world, yet she made little effort to interact or even try to play with them. Instead, she created further instability and negativity by frequently missing calls, unpredictably calling when the children were unavailable or asleep, and giving up by prematurely ending the call when the children were distracted. Consequently, by the time the pandemic restrictions were about to be lifted, A.C. did not recognize Mother, and C.S. tried to avoid contact by hiding his face or crying when Mother called.

When in person visitation resumed in September 2020, Mother tried to be consistent, but visits were suspended when she tested positive for the virus and was briefly incarcerated. Faced again with the prospect of virtual visitation, Mother did not rise to the challenge or make the effort needed to maintain a regular and consistent presence in her children's lives.

In light of the above, we conclude substantial evidence supported the trial court's determination Mother failed to satisfy the benefit exception's first prong by maintaining regular visitation and contact with children. During the case, the social workers stressed with Mother the importance of visiting and keeping in contact with her young children. It is telling that in over two years, the social worker never reported the children asking to see Mother. Due to Mother's long absences and failure to prioritize

contact with them, the children never had a chance to develop a strong emotional attachment to her.

Because Mother failed to meet her burden of proof to show she regularly visited and contacted her children, we need not address the second prong of the benefit exception, which requires the court to determine if the children would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i); *In re Amanda D.* (1997) 55 Cal.App.4th 813, 821 [both prongs must be satisfied for the exception to apply].)

DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

MOORE, J.

MARKS, J.*

*Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.