Filed 10/13/22  In re J.L. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.L., a Person Coming Under the Juvenile Court Law. | B317881 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK24437A) |
| Plaintiff and Respondent, | |
| v. | |
| T.L., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  D. Brett Bianco, Judge.  Conditionally reversed in part and affirmed in part.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Raquel Ramirez, Senior Deputy County Counsel for Plaintiff and Respondent.

————————————————

T.L. (Mother) appeals from an order terminating her parental rights to her son J.L. Mother argues that the order terminating parental rights should be reversed because she was deprived of a fair and meaningful opportunity to establish the parental-benefit exception to adoption when she was denied in-person visits with J.L. and a bonding study. In the alternative, she argues that the juvenile court erred in concluding that the parental-benefit exception did not apply. Mother further claims that the Los Angeles County Department of Children and Family Services (DCFS) and the juvenile court failed to comply with Section 1903 of the Indian Child Welfare Act (25 U.S.C. Sec. 1901 et seq.) (ICWA) and section 224.2 of the Welfare and Institutions Code as to J.L.'s father's (Father or R.W.) reported Cherokee Indian heritage.[1]

We conclude that Mother was not deprived of a fair and meaningful right to assert the parental-benefit exception to adoption in section 366.26, subdivision (c)(1)(B)(i) and the juvenile court did not err in finding Mother had failed to establish that the parental-benefit exception applied. We find that reversal is warranted due to the failure of DCFS and the juvenile court to comply with ICWA and related state law.

Accordingly, we conditionally reverse the order terminating parental rights and remand with directions for the juvenile court to order DCFS to comply with ICWA and related California law

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

as to potential paternal Indian heritage.[2]  The order is otherwise affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND[3]

### A.     Initial Petition Through Reunification Period

In May 2017, J.L. was approximately eight years old. He came to the attention of a New Jersey juvenile court when Mother was accused of physically abusing his half-sibling and engaging in domestic violence with his half-siblings' father while she was residing in New Jersey.

In July 2017, Mother, J.L.'s two half siblings, and the half-siblings' father moved to California, where J.L. already lived with his maternal grandmother (Grandmother).  With Mother's permission, J.L. had already been in the care of and living with Grandmother since he was six months old.  A New Jersey court had also granted Grandmother custody of J.L. when he was two years old.

---

[2]     Father does not appeal, but Mother may raise ICWA errors on appeal related to Father.  (*In re A.W.* (2019) 38 Cal.App.5th 655, 663.)

Additionally, a reversal of the juvenile court's order terminating a father's parental rights must also result in a reversal of an order terminating a mother's parental rights. (Cal. Rules of Court, rule 5.725(a)(1) & (f) ["The purpose of termination of parental rights is to free the [dependent] child for adoption.  Therefore, the court must not terminate the rights of only one parent . . . " except in certain circumstances not applicable here]; see also *Los Angeles County Dept. of Children and Fam. Services v. Superior Court (Rebecca H.)* (2000) 83 Cal.App.4th 947, 949.)

[3]     This appeal only concerns J.L., and not his siblings, so the factual background focuses on J.L.

With the family now in California, DCFS received a referral that Mother had physically abused J.L. and his half-siblings and that the children had been exposed to domestic violence.

In August 2017, DCFS filed a section 300 petition on behalf of J.L. and his half-siblings alleging physical abuse of the children by Mother and domestic violence between Mother and the half-siblings' father that placed the children at serious risk of harm. That same month, the juvenile court ordered J.L. and his half-siblings detained from Mother in the home of Grandmother, and ordered Mother monitored visits three times a week for three hours each, or a total of nine hours a week.

In December 2017, the juvenile court held an adjudication hearing. Mother pled no contest. The court sustained allegations relating to domestic violence and physical abuse by Mother. That same month, a DCFS social worker monitored a visit between J.L. and Mother that was ended early due to J.L.'s behavior, although the details of that behavior are not in the record. Mother told the social worker that she would not "push [J.L.] to visit her at this time."

In February 2018, the juvenile court held a disposition hearing where it ordered J.L. removed from Mother and ordered family reunification services for Mother. The court ordered monitored visitation for Mother three times a week for three hours.

Around the same time, J.L. began receiving mental health services. He qualified for special educational services and became a Regional Center client due to diagnoses of Autism Disorder and Disruptive Mood Disorder. He was hospitalized in April and May 2018 for mental health reasons. He began

4

meeting with a therapist once a week, a child and family specialist once a week, and with an entire "wraparound" team once a week. The juvenile court also ordered joint counseling for Mother and J.L., but J.L.'s wrapround team determined he was not yet ready to meet with Mother and the therapist because he had just started to open up to the therapist on his own. In July 2018, J.L.'s therapist reported that J.L. was still not ready for joint therapy with Mother.

In spring and summer of 2018, J.L.'s in-person visits with Mother were sporadic. DCFS monitors went to pick him up for visits, but he often refused to attend. In September 2018, another in-person visit with Mother and J.L. was terminated early due to J.L.'s behavior, which required him to be restrained by Mother, her partner, and his half-siblings.

DCFS then suggested that visits be set up only between J.L. and Mother (i.e., no longer together with his half-siblings and their father) to promote bonding. J.L. also refused to attend these visits and told the monitor he did not want to visit Mother, stating "she sucks" and "I hate her."

In March 2019, the juvenile court held a contested review hearing. The court found that Mother's compliance with reunification services was only partial, terminated her reunification services, and set a section 366.26 permanency planning hearing for July 2019.

## B. Permanency Planning Period and Termination of Parental Rights

During the permanency planning period, J.L.'s behavior at home "improved" and he graduated from wraparound services. He continued with therapy and also saw a psychiatrist for medication needs. He was "consistent in his statements

regarding his desire to remain in the home of his prospective legal guardians [his maternal grandparents] permanently."

J.L. continued to generally refuse to attend in-person visits with Mother and only wanted contact with her if it did not disrupt his routine, again stating that she could visit him while he engaged in his normal, everyday activities. J.L. usually did not want to speak with Mother by phone and if he did, it was only for a short time.

In July 2019, Mother filed a section 388 petition requesting overnight and unmonitored visits with J.L., the reinstatement of reunification services, and a finding that returning J.L. to her care was the appropriate permanent plan. She attached a document detailing her contact with J.L. from March 2019 to June 2019, which included phone, video, and in-person visits.

J.L.'s behavior outside the home, such as at school, continued to be an issue and was triggered when he was "asked to do something that he simply does not want to do." He attacked several individuals, including a classmate and staff member at a summer camp in July 2019 after being told he would have to attend dependency court and possibly testify concerning Mother's recently filed section 388 petition.

In both June and August 2019, J.L. was hospitalized after threatening to kill himself.

In September 2019, DCFS approved "1-on-1 services" due to J.L.'s behavior and need for constant supervision.

Due to a concern with J.L.'s "escalating behaviors," in September 2019 there was a meeting with J.L.'s multiple therapists and mental health team, Grandmother, and a DCFS social worker about J.L. being "triggered" when he had contact with Mother. This group developed a plan for remote visitation

between J.L. and Mother three times a week, because J.L.'s contact with Mother "counter[acted] the work that J.L. w[as] doing with his service providers." In November 2019, Mother agreed to this remote visitation plan due to J.L.'s continued refusal to meet with her in person. The plan was for set for video visits three times a week at specific times that worked for both Mother and J.L.

In January 2020, DFCS reported that J.L.'s behavior at school had improved, although his teacher reported that his behavior quickly escalated and he sometimes had to be physically restrained. J.L. responded well to the care of his "1-on-1 aide" and continued to want to remain in the care of Grandmother.

J.L. still did not want to visit with Mother in person and was unpredictable as to whether he would visit with her by phone. Sometimes he would take Mother's call but only listen to her and not speak, and sometimes he would participate in the call.

In summer of 2020, Grandmother organized visits in her home that included J.L., Mother, and J.L.'s half siblings. J.L. went upstairs during these visits and would not engage with Mother. During this time, Mother did not attempt to arrange any visits with J.L. by video or phone, nor did she arrange any additional in-person visits. J.L. said he did not want to leave his home to visit Mother, but he did not care if she visited his home.

In September 2020, the juvenile court appointed a guardian ad litem for J.L.

In December 2020, the juvenile court denied Mother's first section 388 petition (the hearing for which had been continued multiple times, mostly because of the COVID 19 pandemic),

finding adoption to be the appropriate permanent plan and no reason to change the case plan.

In April 2021, Mother filed a second section 388 petition requesting return of J.L. to her care, termination of the section 366.26 hearing, reinstatement of reunification services, and unmonitored visits, including overnights and weekends. She reported that between December 2020 and April 2021, she and J.L. had 30 out of 41 scheduled video visits via Facebook messenger or visits by phone, that their relationship had grown over that time, and that J.L. had expressed wanting her to call on days she was not scheduled to call and that he was open to visiting Mother in her home. The juvenile court denied the petition, finding a lack of a change in circumstances.

In June 2021, J.L. was reported by his teacher to be doing "very well." He also developed a relationship with his "Behavioral Technician" and looked forward to visits with him.

In October 2021, Grandmother reported that Mother had not been consistent with visits as set by the visitation plan, but had been more consistent since the April 2021 section 388 hearing. Meanwhile, J.L. continued to visit with Mother by phone or video, but the visits were mostly brief due to J.L. ending the call. J.L. continued to maintain he would not visit Mother in person unless it did not disrupt his daily routine, but again indicated that Mother could visit him in his home. J.L. told a social worker that he wanted his Grandmother and maternal grandfather to adopt him.

In January 2022, the court held the section 366.26 hearing. Mother and J.L.'s court-appointed guardian both testified. Mother testified that for the past six months, she had visited J.L. on an average of twice a week for about 20 minutes, and the

8

visits occurred via Facebook video messenger.  Mother's counsel asserted that the parental-benefit exception to adoption applied, but the guardian and J.L.'s attorney argued against it, and the juvenile court found that it did not apply.  The court found J.L. adoptable and terminated parental rights.

This appeal by Mother followed.  Father did not appeal.

**C.  Paternity and ICWA Inquiry**

During the initial stages of the investigation, DCFS inquired of Mother as to J.L.'s possible Indian heritage, which she denied.  The social worker then filed an ICWA 010(A) form stating that J.L. had no known Indian heritage, and wrote that Mother was the sole person questioned.  Mother also filed an ICWA-020 form stating she had no Indian ancestry.

Based on these documents, at the September 2017 detention hearing the juvenile court found that ICWA did not apply "as to Mother."  At that time, it was unknown who J.L.'s biological father was, and the court deferred a paternity finding for the appearance of J.L.'s biological father and/or the receipt of J.L.'s birth certificate.

J.L.'s birth certificate did not list a father.  Mother provided DCFS with the full names and birthdays of two individuals who could be J.L.'s biological father.  Shortly afterwards, one of these individuals denied paternity.  Meanwhile, DCFS searched for the other individual, R.W., while the court continued the section 366.26 hearing on multiple occasions so that R.W. could be located.

In May 2021, DCFS received a phone call from an individual who identified himself as R.W.'s brother.  He said that R.W. was in prison, but the brother did not know the location. DCFS eventually located and spoke with R.W. who confirmed

prior involvement with Mother, and who also provided DCFS contact information for his sister.

R.W. also told the DCFS social worker that he was half-Cherokee through his mother, but that he was not a member of the Cherokee tribe. There is no evidence that DCFS asked anyone besides R.W. about potential Indian heritage, such as R.W.'s brother or sister.

In May 2021, the juvenile court ordered paternity testing for R.W. and J.L., which, in October 2021, confirmed that R.W. was indeed J.L's biological father. That same month, the juvenile court continued the section 366.26 hearing in order to obtain waiver of R.W.'s appearance or to facilitate a remote appearance.

At the final 366.26 hearing in January 2022, at which R.W. appeared remotely, the juvenile court found that R.W. was J.L.'s biological father. The court did not make any ICWA finding as to R.W. at this hearing, nor at any other time.

## DISCUSSION

## I. Mother Was Not Deprived of a Fair and Meaningful Opportunity to Establish the Parental-Benefit Exception to Adoption.

Mother argues reversal is warranted under our decision in *In re Hunter S.* (2006) 142 Cal.App.4th 1497 (*Hunter S.*) because she was deprived of a "fair and meaningful opportunity" to establish the parental-benefit exception to adoption. We disagree.

### A. In-Person Visits

Mother first claims that when her visitation changed from in-person visits to video or phone visits, it prevented her from establishing a bond with J.L. and thus from proving the parental-

10

benefit exception to adoption applied, in violation of our decision in *Hunter S.*, *supra*, 142 Cal.App.4th 1497.

In *Hunter S.* we acknowledged that "[c]ourts have long recognized that, in the context of dependency proceedings, a lack of visitation may 'virtually assure[ ] the erosion (and termination) of any meaningful relationship' between mother and child. [Citation.]" (*Hunter S.*, *supra*, 142 Cal.App.4th at p. 1504.) We thus held that a "juvenile court cannot impermissibly delegate to the child's therapist, DCFS or any third person, unlimited discretion to determine whether visitation is to occur. [Citation.] In no case may a child be allowed to control whether visitation occurs. [Citations.]" (*Id.* at p. 1505.)

The facts here are materially different than those in *Hunter S.* in two significant respects. First, Mother appears to have forfeited her argument by not requesting enforcement of the in-person visitation order from the juvenile court. "When a child refuses visitation, it is the parent's burden to request a specific type of enforcement, or a specific change to the visitation order. Absent a request, it is not the court's burden to sua sponte come up with a solution to the intractable problem of a child's steadfast refusal to visit a parent." (*In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046.) Here, Mother never petitioned the court to enforce in-person visits after J.L. refused to visit with her in person. Her sole request to the court regarding visitation was in June 2019 (prior to her agreeing to video visits in November 2019) when she asked for unmonitored, overnight, and weekend visits. In contrast, in *Hunter S.*, the mother "consistently raised the issue of the juvenile court's failure to enforce its visitation order for over two years." (*Hunter S.*, *supra*, 142 Cal.App.4th at p. 1505.)

11

She also filed a section 388 motion explicitly raising the issue of lack of visitation, which she then appealed.  (*Id.* at p. 1500.)

Second, even if Mother had not forfeited her argument by failing to raise it below, Mother was not deprived of visitation, unlike in *Hunter S.*  (Compare *Hunter S., supra*, 142 Cal.App.4th at p. 1503 [child refused "all contact" except for one visit].)  The change to video visitation for the period between November 2019 and the summer of 2020 was not an abdication of the juvenile court's order mandating visitation; it simply changed the means of visitation.  (Compare, *Hunter S., supra*, 142 Cal.App.4th at p. 1506 ["It was that failure to enforce the order that [mother] brought to the court's attention in her petition.  She points out that, by refusing to enforce its order, the court *effectively denied her visits, joint therapy, and virtually all contact with her son. . . .*"]  (Italics added).)

There is ample evidence of visitation, and, by Mother's own testimony, the video visitation was "grow[ing]" her relationship with her son.  In April 2021, Mother reported that between late December 2020 and early April 2021, she and Joshua had 30 out of 41 scheduled video or phone visits.  She stated that their conversations had "grown" over time, J.L. had recently expressed that he wanted her to call him on days that she was not scheduled to call him, and he was now open to visiting her in her new home.  In January 2022, Mother testified that for the past six months, on average she had contact with J.L. by video twice a week for 20 minutes.  She further testified that she "wanted to give J.L. and my relationship a chance to grow organically." According to Mother, J.L. had become "more open" when they originally started their "phone conversation[s]."  Mother's testimony is thus essentially that the video and phone visits grew

12

her bond with J.L.  Although the relationship may have grown even more through in-person visits, the record suggests otherwise.  While the phone visits grew the mother-son relationship, J.L. did not engage with Mother when she visited his home.

Moreover, Grandmother and DCFS reported a gap in visitation by any means and a lack of in-person visits that was entirely attributed to Mother.  A few times during the summer of 2020, Grandmother hosted in-person visits at her home between J.L. and Mother, which also included J.L.'s half-siblings.  During those visits, J.L. did not engage with Mother and mostly remained upstairs.  While J.L. maintained he did not wish to visit with Mother outside of his home, he "did not care if she visited [his] home."  Yet, during the summer of 2020 and for months afterwards, Mother did not attempt to contact J.L. by telephone or video, nor did she ever request any additional in-person visits in J.L.'s home.

In sum, unlike in *Hunter S.*, *supra*, 142 Cal.App.4th 1497, Mother visited with J.L. and this visitation—according to Mother's own testimony—*grew* their relationship.  Mother agreed to these remote visits and never asked the juvenile court to enforce its in-person visitation order.  Even once J.L. agreed to resume in-person visits in his home, Mother did not attempt to arrange any after the few that took place in the summer of 2020.  Mother was not prevented from visiting with J.L. and thus not prevented from establishing the parental-benefit exception under *Hunter S.*

**B. Bonding Study**

Mother also contends that the juvenile court violated her due process rights by denying her a bonding study, again citing *Hunter S.*, *supra*, 142 Cal.App.4th 1497.

Evidence Code section 730 permits the juvenile court to appoint an expert to study and report on the bond between a parent and child. (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.) An expert's bonding study can be relevant to the question of whether the parental-benefit exception should prevent the termination of parental rights. But a bonding study is not mandated under any law. "There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" the termination of parental rights. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339 (*Lorenzo C.*).) Rather, the court's decision to order a bonding study is an exercise of discretion. (*Ibid.*)

It is not an abuse of discretion to deny a bonding study when "it is unlikely that a bonding study would have been useful to the juvenile court." (*Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1341.) The juvenile court denied Mother a bonding study because it determined that it would be inappropriate and irrelevant based on the information it already had before it on J.L.'s relationship with Mother. This information included a letter from Marcos Aguilar, Jr., the Assistant Clinical Director of Special Needs Network, Inc., where J.L. was receiving Applied Behavioral Analysis (ABA) services. Aguilar's letter, dated October 2021, stated that J.L. had been receiving ABA services since March 2020 and J.L. "does not have the capacity to express himself concerning personal life circumstances and solely makes decisions for immediate impact on his personal gains. [J.L.]

14

continues to struggle with his ability to comprehend personal questions and his ability to provide meaningful responses to questions about his personal circumstances. Lastly, his capacity to capture [*sic*] truth may be impacted by his motivation to escape social interactions and may in turn evoke false responses from [J.L.]." Although a bonding study may have provided insightful information, we cannot conclude that it was an abuse of the juvenile court's discretion to conclude otherwise on the basis of the evidence before it as to J.L.'s feelings towards Mother, described *post* in parts II.B.-C., and J.L.'s reported inability to provide meaningful or accurate responses to questions.

A juvenile court is also within its discretion to deny a late request for a bonding study. " '[T]he denial of a belated request for [a bonding] study is fully consistent with the scheme of the dependency statutes, and with due process.' [Citation.]" (*In re M.M.* (2022) 81 Cal.App.5th 61, 69 (*M.M.*).) Mother requested a bonding study in October 2021, and the original section 366.36 hearing was set for July 2019, although it was continued numerous times due to the COVID-19 pandemic and efforts to locate J.L.'s father. At the time Mother requested the bonding study, the section 366.36 hearing was scheduled for the following month and would thus have required a continuance.[4] "[C]ontinuances in juvenile court are disfavored. [Citation.]" (*M.M.*, *supra*, 81 Cal.App.5th at p. 69.)

---

[4] The section 366.36 hearing was continued again from November 2021 and finally held on January 11, 2022, which is less than three months after Mother requested the bonding study, due to efforts to locate J.L.'s father.

Embedded in Mother's arguments regarding the need for a bonding study is the argument that because L.H. was over 12-years old at the time of the section 366.26 hearing, and section 366.26, subdivision (c)(1)(B)(ii) permits an exception to adoption when a child who is at least 12-years old specifically objects to the termination of parental rights, a bonding study was needed to uncover J.L.'s wishes as to termination of parental rights.

Mother does not cite any legal support for this claim, and applicable case law does not support her contention.  In considering a child's wishes under section 366.26, subdivision (c)(1)(B)(ii), a juvenile court may properly consider the child's wishes without a "direct statement" by the child as to termination of parental rights.  (*In re Leo M.* (1993) 19 Cal.App.4th 1583, 1592 ["While a direct statement of a minor's feelings regarding termination is certainly the most dispositive of the minor's wishes, it will not always be possible or in the minor's best interest to obtain such a statement"]; *In re Amanda D.* (1997) 55 Cal.App.4th 813, 820 [finding that the juvenile court could "infer[]" the minor's wishes from the evidence of his statements about his caregivers and evidence of how he reacted to visits from the parent]; *In re Jesse B.* (1992) 8 Cal.App.4th 845, 853 [noting that direct testimony may not be possible in cases where the child has a disability].)

Here, when the social worker asked J.L. if he knew what adoption was, he replied, "yes. . . . [A]doption is with the people who are caring for you [sic] want [sic] to stay with them and have you forever."  When asked if he wanted his current caregivers to adopt him, he said yes, and he also stated that he wanted to continue to live with his caregivers and have visits with Mother.  These statements, along with the record evidence, described *post*

16

in parts II.B.-C., of how J.L. felt about Mother, and the testimony by L.H.'s court-appointed guardian on his behalf that termination of parental rights was appropriate, were sufficient for the juvenile court to find that L.H. did not object to the termination of parental rights.

Mother's citation to *Hunter S.*, *supra*, 142 Cal.App.4th 1497 does not mandate a different result. *Hunter S.* concerned the deprivation of mother's right to visitation, which it found prevented her from establishing a bond with her child. It does not address bonding studies, which are discretionary. (*Lorenzo C., supra*, 54 Cal.App.4th at p. 1339.)

For these reasons, we do not find that the juvenile court abused its discretion in failing to order a bonding study.

## II. Mother Failed to Establish the Parental-Benefit Exception to Adoption.

In the alternative, Mother argues that the juvenile court erred in concluding that the parental-benefit exception did not apply. We disagree.

Where, as here, "a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*); see also § 366.26, subd. (c)(1)(B).) If the parent demonstrates these three things, then the parental-benefit exception to adoption applies and the juvenile

17

court should not terminate parental rights but "should select a permanent plan other than adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.)

When reviewing the juvenile court's findings regarding the parental-benefit exception, we apply two different standards of review. (*Caden C., supra*, 11 Cal.5th at pp. 639–641.) We review the first two elements (parental visitation and the child's emotional attachment), which require factual findings, for substantial evidence. This requires us to determine if there is reasonable, credible evidence of social value to support the court's order, and we resolve all conflicts in favor of affirmance. (*In re M.G.* (2022) 80 Cal.App.5th 836, 848 (*M.G.*).) For the third element, a legal question, we apply the abuse of discretion standard. (*Ibid.*, citing *Caden C., supra*, 11 Cal.5th at p. 640.) A court abuses its discretion when it makes an arbitrary, capricious, or patently absurd determination or its decision rests on an error of law. (*M.G.*, *supra*, 80 Cal.App.5th at pp. 848–849.)

### A. Element One: Visitation

Mother contends that the court found she demonstrated the first element of visitation, citing the minute order from the section 366.26 hearing that reads, "The court finds that the parent has maintained visitation with the child . . . .", so she does not challenge this element on appeal. DCFS points out that this statement in the court transcript is in conflict with the reporter's transcript, which states, "[t]he court finds that . . . [t]here has been some visitation but certainly not what we would expect and that does not even take into account the extent of visitation that's allowed under the circumstances with the pandemic and the distance."

In general, conflicts between a reporter's transcript and a clerk's transcript are resolved in favor of the reporter's transcript. (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 249.)  Regardless, we do not need to determine what the court found as to this element and whether its determination was correct because we uphold the court's conclusions that Mother failed to establish the second and third elements of the parental-benefit exception, as discussed below.

## B. Element Two:  J.L.'s Emotional Attachment to Mother

Mother argues that the juvenile court's conclusion that she failed to establish the second prong of the parental-benefit exception is not supported by substantial evidence.

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.'  (§ 366.26, subd. (c)(1)(B)(i).) . . . [T]he focus is the child.  And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'  [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

We find substantial evidence to support the juvenile court's determination that Mother did not meet her burden of showing that J.L. would benefit from a continued relationship with Mother.  In particular, as the juvenile court found, Mother's testimony that she wanted to "grow" her relationship with J.L. "organically sort of belies the notion that there is this substantial positive emotional attachment to the parent that the child has right now . . . ."

The court also noted that J.L. had lived with Grandmother "essentially his entire life," because J.L. had lived with her since he was six months old and was 13 years old at the time of the section 366.26 hearing, and thus had spent very little of his life in Mother's custody.

Moreover, there was evidence that J.L. had little to no positive effects from his interactions with Mother. He refused to visit her alone, a visit with her had to be cut short due to his acting out, he sometimes did not speak to her during visits at all or spoke very little, he did not interact with her when she visited his home, he appeared "triggered" by any discussion of Mother in therapy and refused to speak about or attend joint therapy with her, and he frequently refused to visit with her outside of his home even if accompanied by a DCFS social worker or his one-on-one aide, with whom he had a good relationship. J.L. was mostly concerned about how his contact with Mother might disrupt his daily routine and only wanted to visit with her in person if she came to his home. Grandmother also reported that Mother would yell and scream at J.L. during visits.

In addition, J.L. had particular needs that Mother was not able to meet, according to the evidence. J.L. has autism spectrum disorder, unspecified attention-deficit/hyperactivity disorder, adjustment disorders, and disruptive mood dysregulation disorder. He has been hospitalized at least twice for mental health issues and requires ongoing mental health services and a special educational plan. There is evidence that Grandmother was meeting these extensive needs by facilitating his meetings with mental health professionals, arranging special educational services, and through their lengthy, strong relationship. In contrast, an evaluator hired by the juvenile court to assess

Mother's own mental health and psychological diagnoses, which had resulted in her own hospitalization on several occasions, stated that Mother had little insight into her own mental health issues and how they were negatively influencing her interpersonal interactions. J.L.'s court-appointed guardian also testified that Mother was "unable or did not even discuss [J.L.'s] severe and significant issues and needs and how she even played a role in that."

Substantial evidence therefore supports the juvenile court's conclusion that Mother did not establish element two of the parental-benefit exception.

### C. Element Three: Balancing Termination with the Benefit of Adoption

Mother also argues that the court erred in finding that she failed to establish the third element of the parental-benefit exception, a determination we review for an abuse of discretion. (*Caden C., supra*, 11 Cal.5th at p. 640.)

In analyzing "the third element — whether 'termination would be detrimental to the child due to' the relationship [with the parent] — the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.]" (*Caden C., supra*, 11 Cal.5th at p. 633.) In making this decision, the court must weigh the benefits and disadvantages of the child's potential life in an adoptive placement against the benefits and disadvantages of continuing the parental bond and a less secure placement. (*Ibid.*) This evaluation necessarily involves a "delicate balancing" in "assessing the likely course of a future situation that's inherently uncertain." (*Caden C., supra*, 11 Cal.5th at p. 640.)

The juvenile court found that the benefits of adoption by Grandmother outweighed the harm of J.L. losing a relationship with Mother. This determination was not an abuse of discretion. J.L. has a significant bond with Grandmother, with whom he has lived since he was six months old. Grandmother reportedly has provided him with a stable home and, as noted above, has helped to address his significant mental health and special education needs. The juvenile court appropriately found that Grandmother was his mother for all "practical purposes," given the length of time he had lived with her and that their relationship was "durable and stable." J.L. also expressed that he wanted to continue to live with Grandmother and wanted her to adopt him.

In contrast, J.L.'s relationship with Mother was not so helpful or positive as to outweigh the benefits of his permanent placement with Grandmother. As detailed above, J.L. had little to no positive effects from his interactions with Mother and she did not recognize J.L.'s severe and significant medical diagnoses and special needs. (See *In re J.C.* (2014) 226 Cal.App.4th 503, 530 [" 'a parent may [not] establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact' "].)

In sum, the juvenile court's decision as to the third element of the parental-benefit exception was not arbitrary, capricious, or absurd. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The court had handled J.L.'s case from August 2017 to January 2022, and was well informed of J.L.'s relationships with both Grandmother and Mother such that it could engage in the "delicate balancing" it was required to undertake. (*Id.* at p. 640.) Its decision was well within its discretion.

**III. The Court Erred in Finding That ICWA Did Not Apply.**

Lastly, Mother argues that the juvenile court and DCFS failed to satisfy their duties under ICWA and related California law after R.W. reported Cherokee heritage. DCFS concedes that it failed in its duty of further inquiry, but asserts that its initial inquiry was sufficient. We agree with Mother that DCFS failed in its duties of both initial and further inquiry, and the juvenile court also failed to inquire after J.L.'s father was identified, such that there is reversable error.

We review the juvenile court's ICWA findings under the substantial evidence test. (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401 (*Josiah T.*).) "ICWA reflects a congressional determination to protect American Indian children and to promote the stability and security of Indian tribes and families." (*Josiah T.*, *supra,* 71 Cal.App.5th at p. 401.) In ICWA, Congress established procedural rules applicable in dependency cases to ensure that if an Indian child is involved, they are properly identified. (*Ibid.*; 25 C.F.R § 23.107(a).)

Federal regulations implementing ICWA provide that "[s]tate courts must ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child[]" and that "[s]tate courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (25 C.F.R § 23.107(a).)

Under state law, the juvenile court and DCFS both additionally have a " 'continuing duty to inquire' " whether the child is an Indian child. (*In re D.F.* (2020) 55 Cal.App.5th 558,

566 (*D.F.*), citing § 224.2, subd. (a).) This duty has three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice. (*Ibid.*)

The initial inquiry phase requires DCFS to ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) At each participant's first appearance at dependency proceedings, the court must ask whether the participant knows or has reason to know the child is an Indian child. (*Id.*, subd. (c).)

Both the court and DCFS must make "further inquiry" if they have "reason to believe" an Indian child is involved. (§ 224.2, subd. (e).) The Legislature has defined "reason to believe" as "information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know [the child is an Indian child]." (*Id.*, subd. (e)(1).)

If "further inquiry" is required, the next steps DCFS must take, include, but are not limited to, interviewing parents and extended family members, and notifying the Bureau of Indian Affairs and any tribes that "may reasonably be expected to have information regarding the child's membership, status or eligibility." (§ 224.2, subd. (e)(2)(B); see also Cal. Rules of Court, rule 5.481(a)(4).)

24

The final phase, the duty to provide formal notice, is triggered only if there is "reason to know" a child is an Indian child. (§ 224.3, subd.(a).)

Mother argues that DCFS failed in its duties of initial and further inquiry. We agree. The juvenile court found that ICWA did not apply to J.L. on the basis of Mother's ICWA 020 form only.[5] It is undisputed that J.L.'s biological father, R.W., told DCFS he was "half Cherokee." It is also undisputed that DCFS had contact with R.W.'s brother, but did not question him as to potential Indian ancestry, and contact information for R.W.'s sister. (*Josiah T.*, *supra*, 71 Cal.App.5th at pp. 403–404 [finding error in the initial inquiry stage where the social worker failed to ask extended family member with whom social worker had contact about Indian ancestry].) There is no evidence that DCFS questioned any other paternal family members as to potential Indian heritage, or asked R.W. whether any were available to be questioned.

The juvenile court also did not question R.W. as to Indian heritage when he appeared before the court in January 2022, nor did it state that it received an ICWA-020 form for R.W., and the parties do not point to any such form in the record.

Accordingly, both DCFS and the juvenile court erred in their duties of initial inquiry.

---

[5] At the time it made this finding, it was unknown who J.L.'s biological father was, and the finding was made solely on the basis of Mother's ICWA form denying her own Indian ancestry. Despite its continuing duty of inquiry, once the juvenile court determined who J.L.'s biological father was, it did not revisit this finding.

25

We reverse error in the initial inquiry only if this error is prejudicial.  (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742 [citing Cal. Const., art. VI, § 13].)  We need not make this determination here, however, because both parties contend that reversal is warranted due to DCFS's failure to comply with its duty of further inquiry, and we agree with them.  R.W.'s statement that he was "half Cherokee" is a "reason to believe" an Indian child is involved sufficient to trigger the duty of further inquiry.  (see § 224.2, subd. (e); *D.F.*, *supra*, 55 Cal.App.5th at p. 569.)  DCFS was required to further interview R.W., to interview extended family members, and give notice to the Bureau of Indian Affairs and Cherokee tribe, but did not do so.  (See § 224.2, subd. (e)(2)(B); see also Cal. Rules of Court, rule 5.481(a)(4).)  At this stage of further inquiry, DCFS was required to contact all relevant Cherokee tribes and the Bureau of Indian Affairs.  (*D.F.*, *supra*, 55 Cal.App.5th at pp. 569–571.)

Accordingly, we reverse and remand for compliance with ICWA and related California law.

## DISPOSITION

The juvenile court's order terminating parental rights is conditionally reversed.  The matter is remanded for further proceedings to satisfy requirements under ICWA and related California law as to possible paternal Indian heritage.
The juvenile court is required to order that DCFS comply with its duty of further inquiry under 224.2, subdivision (e)(2)(B).
The juvenile court shall order that within 45 days of the remittitur, DCFS report to the court its investigation of J.L.'s potential Indian ancestry through R.W.

If a tribe responds to the required notice and indicates that J.L. is an Indian child, and seeks intervention, then the juvenile

court's orders shall be vacated and proceedings consistent with ICWA conducted.  If no tribe responds that J.L. is an Indian child, or if no tribe seeks to intervene, the court should then reinstate its section 366.26 order.

In all other respects, the order terminating parental rights is affirmed.


HARUTUNIAN, J.<sup>*</sup>

We concur:


GRIMES, Acting P. J.


WILEY, J.

---

\*     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27